**Robert**

**From:** "Robert Magrini" <rmagrini@hmglawyers.com>
**To:** "Stephen T. Blanchard" <Stephen.T.Blanchard@sas02.usace.army.mil>
**Cc:** "Tom LaGalle" <tom.lagalle@earthlink.net>; "George Todd" <gtodd@coxinet.net>
**Sent:** Thursday, April 20, 2006 9:59 AM
**Attach:** Contractor comments 3003.doc; Contractor comments 3004.doc
**Subject:** Response to Government Evaluations - Job #3003 and #3004

Steve,

I am forwarding to you Todd's comments to the Government's proposed performance evaluations. The comments are being entered into the CCASS system. On behalf of Todd, I am requesting that the Government refrain from posting any final evaluations until after the parties have an opportunity to discuss all outstanding issues. Steve, I do not have the contact information on the contracting officer. Do you mind forwarding these comments and our request for a meeting to him or her? Please let me know what dates are convenient for meeting over the next few weeks. Thank you.

Robert L. Magrini

EXHIBIT
B

Response to Government Evaluation-job #3003- bldg 3611

Todd Construction has not and will not deny that this project has had more problems than almost any other we have ever worked on in the past. However, Todd believes that the proposed "unsatisfactory" performance evaluation is unwarranted. A review of the file reveals that Todd took extraordinary steps to supervise, manage, coordinate and control its subcontractors. It was also responsive to the Government's concerns and did everything possible to resolve issues with its subcontractors. Without question, the problems with subcontractors made it difficult to develop and submit in a timely fashion a meaningful construction schedule. However, there were other problems – design issues, the shifting of engineering responsibility to Todd, materials shortages, etc. – that severely impacted Todd's progress. Notwithstanding these events, the Government never lost use of these facilities.

This project began based on a site visit on September 4 and 5, 2003. This site was one of 16 that were visited in a 2 day period. Proposals were due in Savannah on September 15, 2003, which afforded little opportunity to inspect any of the jobsites beyond learning their respective locations at Seymour Johnson AFB.

The original low bidder for this project was a subcontractor recommended by Government personnel for having done satisfactory work of a similar nature at Seymour Johnson AFB. Todd Construction's bid price was based on their quote and the Government's recommendation.

Following award of this delivery order by the Government on September 29, 2003, Todd's first tier subcontractor moved swiftly to execute a subcontract with the low bidder. By January 12, 2004, when a "Meeting of Mutual Understanding" was held, it appeared the project was going forward without incident. It soon became apparent, however, that the original low bidder was not going to execute a subcontract.

The second bidder was then contacted to take over the project. That subcontractor had completed many similar projects at Ft. Bragg and the local area. Upon negotiation of higher pricing from this subcontractor than Todd had based its proposal on, Todd moved forward absorbing the cost increase.

When this contractor completed the demolition portion of the work it was discovered that the bid document drawings did not represent actual field conditions. Also, the Government plans were not per current building codes. These discoveries resulted in several unanticipated changes in design, approval and material delivery, all of which delayed the project. The design portion alone required investigation, analysis and discussions that were not anticipated by any party. The Government left redesign of the plans to Todd even though this was not a design/build project.

During this portion of the project indications began to surface that the new subcontractor might be having some problems, cash flow and personnel. In fact, the Government determined that the subcontractor had altered submittals without the knowledge of the

structural engineer. Upon this being pointed out, Todd began to take steps to replace this subcontractor with yet another. To minimize further delays during this transitional period, Todd had to continue working with the same structural engineer initially retained by the second subcontractor. Upon approval of the revised design, the materials had to be ordered, fabricated, delivered and installed at a point when material shortages and increasing prices affected every step in the process. Going to a third subcontractor cost Todd a considerable amount of money.

The third subcontractor installed the roof on the three story portion of this building, in our opinion and to our knowledge, with minimal delay and incident.

The roof on the one story portion required separate design as its characteristics are significantly different than the higher roof. Completing this area of the project was further complicated by the fact that it is used as classrooms and is occupied daily. Scheduling of access to this portion was problematic for all involved and resulted in even more delays beyond Todd's control. In addition to all the problems that had been encountered up to this point the third subcontractor ended up in a major disagreement with one of its subcontractors that remains in litigation at this time, once again creating delays in the final punch work. This was further complicated by the Government asking that rework be performed on areas that had already been completed without comment from the Government.

Given all of the unlikely events of this project Todd understands the frustration of the Government but we are still unsure how the "quality control system" is accountable for submittals when the subcontractors involved either refuse to provide them or the field conditions preclude them from being done. The Government was included in discussion with some of these subcontractors and heard the same commitments that Todd heard and agreed at the time that the course of action taken by Todd was the best of all available options.

It occurs to Todd that our efforts to continue with this work and receive a satisfactory rating in 16 of the 33 items for evaluation did not receive consideration. There are no single elements rated at marginal. It seems no consideration has been given to the fact that numerous issues impacted Todd's progress and that Todd spent over $236,000.00 more that the contract amount to complete this project. This figure does not include the liquidated damages held in the amount of $112,944.95 for a total out of pocket cost to date of approximately $349,000.00 on a contract in the amount of $389,262.75. These figures do not include any supervision or overhead. Because it did everything possible to respond to the difficulties on this project and suffered significant financial losses in an effort to rectify problems beyond its control, Todd believes the proposed unsatisfactory evaluation is unfair and not justified.

Response to Government Evaluation-job #3004- bldg 2121

Todd Construction has not and will not deny that this project has had more problems than almost any other we have ever worked on in the past. However, Todd believes that the proposed "unsatisfactory" performance evaluation is unwarranted. A review of the file reveals that Todd took extraordinary steps to supervise, manage, coordinate and control its subcontractors. It was also responsive to the Government's concerns and did everything possible to resolve issues with its subcontractors. Without question, the problems with subcontractors made it difficult to develop and submit in a timely fashion a meaningful construction schedule. However, there were other problems – design issues, the shifting of engineering responsibility to Todd, materials shortages, etc. – that severely impacted Todd's progress. Notwithstanding these events, the Government never lost use of these facilities.

This project began based on a site visit on September 4 and 5, 2003. This site was one of 16 that were visited in a 2 day period. Proposals were due in Savannah on September 15, 2003, which afforded little opportunity to inspect any of the jobsites beyond learning their respective locations at Seymour Johnson AFB.

Upon investigation of the site, it was determined that the plans provided by the Government were no in compliance with current code requirements. The existing conditions were significantly different from what was depicted in the plans. The requirement to remove all existing roof decking and insulation could not be performed due to the critical nature of the activities ongoing in the facility. No alternate facility was available. This required extensive investigation and review of the existing structure so an alternative method could be designed within guidelines of sound engineering practices. The new design was rejected by the Government even though those reviewing the design had never visited the site. The Government left the investigation, review and redesign to Todd. These problems resulted in several unanticipated changes in design, approval and material ordering and delivery, all of which delayed the project.

Upon commencement of work the existing roof began to severely leak due to the activity of the workers as it was so badly deteriorated. Todd replaced a great deal of damaged ceiling tile and insulation as well as continuously cleaned within the building to mitigate the impact of the leaks that were ongoing before this project began. All of this was done by Todd at no additional cost to the Government. Todd was also required to replace approved materials after installation, at no additional cost, because the Government changed its mind about its color selection.

Todd's original subcontractor was terminated by Todd at the suggestion of the Government. This resulted in many further delays and material shortages and changes as well as issues of who would provide warranty documents.

In an attempt to expedite completion of the project, materials were resubmitted for approval by the Government that had not been approved. Months later, after extensive searching for alternative materials, the original submittals were approved by the

Government which caused further delays. These delays resulted in seasonal changes that hampered installation.

Finally, the Government's proposed evaluation states that Todd failed to resolve or repair damaged finish in over 5 months since identification. In fact, the responsible subcontractor did contact its suppliers and their representatives. They came to the site and investigated. The manufacturer's representative determined that if a problem exists it would be with the supplier of the metal for the roof panels. On April 6, 2006, Ned Thomas of Mittal Steel came to the site along with Ken Daly of MBCI. Mr. Thomas said that there is no failure of the roofing product and he did not recommend any action to the affected area as any procedure to remove the staining would, in his opinion, result in more damage than benefit.

It occurs to Todd that our efforts to continue with this work and receive a satisfactory rating in 17 of the 33 items for evaluation did not receive consideration. There are no single elements rated at marginal. It seems no consideration has been given to that fact that Todd continued a dialogue with the Government and made every effort to address project difficulties and minimize inconvenience to the Government.