HAYES MAGRINI & GATEWOOD
ATTORNEYS AT LAW

1220 N. WALKER • OKLAHOMA CITY, OK 73103
405-235-9922 • FAX 405-235-6611
RMAGRINI@HMGLAWYERS.COM

MAILING ADDRESS:
P.O. BOX 60140
OKLAHOMA CITY, OK 73146-0140

August 18, 2006

Fax No. (912) 652-5828 and
<u>VIA FEDERAL EXPRESS</u>
Ms. Rita Miles
Department of the Army
Savannah District Corps of Engineers
100 West Oglethorpe Road
Savannah, Georgia 31402-0889

Re: Todd Construction Company, Inc.

Repair ALS Roof, Bldg. 3611
Project No. VKAG 99-1130
Todd Job No. 3003

Repair Roof Building 2121
Project No. VKAG 00-1165
Todd Job No. 3004

Dear Ms. Miles:

This firm represents Todd Construction Company, Inc. ("Todd"). On July 21, 2006, Todd learned that the Government had entered into the CCASS system unsatisfactory performance evaluations in connection with the referenced projects. Because the evaluations were prematurely posted in violation of Section 5.f. of Regulation No. 415-1-17, they have been withdrawn from the CCASS system. This will serve as Todd's appeal of the unsatisfactory performance ratings. Aside from the fact that the unsatisfactory performance evaluations are unsupported by the evidence, the Government departed significantly from the evaluation procedures mandated by Regulation No. 415-1-17.

I. <u>PROCEDURAL DEFICIENCIES</u>

Regulation No. 415-1-17 establishes the procedure for evaluating construction contractor performance. Section 5.a. provides:

> a. <u>The first step in evaluating contractor's performance is notifying the contractor at the preconstruction conference of the performance elements against which his performance will be evaluated. This notification is documented in the contract file. The contractor should be informed as to what constitutes satisfactory and unsatisfactory performance during the life of the contract, and that the Contracting Officer (CO) intends to use performance evaluations to document contract performance</u>. Documentation to support the evaluation should be collected throughout the course of the contract. (Emphasis supplied.)

EXHIBIT
D

A preconstruction conference was conducted on both projects in November, 2003. Todd has no record or recollection of being told at the preconstruction conference about the applicable "performance elements" or what would constitute "satisfactory or unsatisfactory performance."

A. Interim Performance Evaluations

Section 5.b. establishes a multi-step process leading to the issuance of an interim unsatisfactory performance evaluation. When the ACO or COR notes unsatisfactory performance, the contractor should first be called into a conference to discuss any problem areas and their resolution. A Memorandum For Record ("MFR") is supposed to be prepared by the Government. If the contractor's performance does not improve within 30 days or a reasonable time (whichever is told to the contractor in the initial meeting), the ACO/COR must issue a letter notifying the contractor (and its surety) of the Government's intent to issue an interim unsatisfactory performance rating. The CO is supposed to be kept personally aware of the situation. The contractor must be given 14 days to respond to the notification letter and an opportunity to meet with the CO prior to the issuance of an interim unsatisfactory evaluation. Any factual discrepancies created by the contractor's response to the proposed evaluation must be discussed and resolved if possible. If an interim unsatisfactory report is issued, the contractor's comments are supposed to be included in the report. A copy of the negative evaluation is to be sent to the contractor's bonding company.

The purpose of the specified procedure is obvious. Contractors must be given advance notice of the criteria by which their performance will be judged, specific notice through meeting and letters of how their performance is deficient, a chance to meet with the CO, and an opportunity to correct any deficiencies.

The ACO did not hold a conference with Todd or prepare and issue an MFR prior to notifying Todd that an interim unsatisfactory rating was being considered. Since we are now at the end of the projects and dealing with final (as opposed to interim) performance evaluations, you might ask why the ACO's failure to abide by the procedure governing interim unsatisfactory evaluations is important. The reason is simple. The unsatisfactory ratings on both projects (the interims and the finals) are based, in part, on the ACO's belief that Todd failed to provide submittals and to furnish an acceptable schedule within 60 days from issuance of the notices to proceed. Notices to proceed were issued on September 28 or 29, 2003, thereby triggering the 60 day period for providing submittals. A preconstruction conference was held on November 13, 2003. Again, Todd was not told at the preconstruction conference that the late submission of schedules or submittals could result in an unsatisfactory rating. In fact, at a Meeting of Mutual Understanding held on January 12, 2004, project schedules and submittals were discussed at length with no indication from the Government that Todd's performance at that point was unacceptable. Yet, on February 5, 2004, the ACO notified Todd that the Government was planning to issue interim unsatisfactory performance ratings due to Todd's supposedly late submission of project schedules and submittals.

The Government was obligated, but failed, to give Todd notice and an opportunity to timely cure any performance deficiencies. Had the ACO followed the required procedure, Todd would have been able to expedite the submission of project schedules and submittals.

It is important to note that the process of monitoring a contractor's performance, notifying it of any deficiencies and allowing an opportunity to cure is supposed to continue even after an interim unsatisfactory rating is issued. Section 5.b.(4) provides:

> After the issuance of an interim unsatisfactory rating, the ACO/COR must continue to monitor the contractor's performance, and to document performance improvement, or vice versa, as the case may be. Documents should be in the form of memoranda of meetings, "cure" letters to the contractor, quality assurance reports, photographs, etc. The ACO/COR will re-evaluate the interim unsatisfactory rating every three months until the contract is complete. The re-evaluation should include the reasons why it is in the Government's best interests to allow the contractor to continue performance of the contract. (Emphasis supplied.)

As will be discussed further below, there was an extended period of time (several months) at the end of both projects during which the Government stopped sending any cure notices to Todd. It certainly failed in many respects to caution Todd that the alleged deficiencies in its performance, if left unabated, could result in the issuance of final unsatisfactory performance evaluations.

B. Final Performance Evaluations

Final performance evaluations are supposed to be prepared within 60 days of substantial completion.[1] If an unsatisfactory rating is anticipated, the contractor must be notified in writing, given a chance to meet with the CO, and afforded an opportunity to submit written comments. The Office of Counsel is supposed to be involved in preparing and reviewing the documentation supporting an unsatisfactory performance evaluation. While the Resident Engineer is usually the evaluating official who prepares the report, it must be reviewed for "accuracy and fairness" by an individual "having knowledge of the contractor's performance" at a supervisory level above that of the evaluating official. A final unsatisfactory performance evaluation must be signed by the CO after he or she is satisfied that the "justification and documentation supporting an unsatisfactory rating is adequate." Except for giving Todd notice, a chance to meet with the CO and an opportunity to submit written comments,[2] none of the regulatory procedures were followed in this case. The final performance evaluations were not prepared within 60 days of substantial completion; there is no indication that the Office of Counsel was involved, the reports were not reviewed by an individual

[1]According to the final evaluations, Building 2121 was accepted on September 30, 2005 and Building 3611 was accepted on October 14, 2005. The final evaluations were not prepared until March 22, 2006, over 5 months after the projects were accepted by the Government. The importance of preparing final evaluations in a timely manner while the events surrounding a project are fresh on everyone's mind cannot be overstated. Regardless, this is a regulatory requirement that the Government failed to satisfy.

[2]For some reason, the comments submitted on July 19, 2006, on Todd's behalf by its counsel are not included in the final evaluations.

with knowledge of the contractor's performance at a supervisory level above the Resident Engineer; and it does not appear as if the CO reviewed any documentation supporting the unsatisfactory ratings before signing the evaluations. Indeed, even a cursory review of the project documentation leads to the inescapable conclusion that the grounds for the unsatisfactory ratings cited in the performance evaluations are factually inaccurate.

## II. BUILDING 2121

### A. Project Schedule And Submittals

As noted above, the project schedule and submittals were discussed at length at the Meeting of Mutual Understanding held on January 12, 2004. Although the 60-day time period to furnish a schedule and submittals had expired, the Government did not complain about these items on January 12. Presumably, that is because the Government recognized at the time that there were delays at the outset of the project that were not Todd's fault or responsibility. The plans provided by the Government did not comply with current code requirements. That prolonged the preparation of submittals on the metal building. Notwithstanding the initial delays, submittals were delivered to the Government on December 18, 2003; and, January 15 and 23, 2004.[3]

After the initial delays were resolved, Todd submitted a project schedule to the Government on February 6, 2004. To expedite completion, Todd provided a schedule showing that it intended to work 7 days per week. The schedule was rejected on February 17, in part, because it included unapproved weekend or holiday work. It is true that Todd did not resubmit a schedule until April 4, 2004. It must be remembered, however, that in February, 2004, differing site conditions were discovered by a subcontractor, Lafayette Construction Co., Inc. ("Lafayette"). The differing site conditions made it impossible for Lafayette to proceed with significant portions of its work and impacted Todd's ability to promptly resubmit a revised project schedule.

### B. Project Delays

There is no doubt this project took longer to complete than expected by any of the parties. It must be emphasized that design deficiencies caused delays at the outset of the project; everything appeared to be moving forward without incident in January, 2004; and different site conditions that remained unresolved for several months were discovered in February, 2004. Although the subject of considerable discussion in February, March and April, a solution to the unforeseen conditions was not agreed upon until May 12, 2004. A corresponding modification was executed by the parties on June 9, 2004, and work proceeded in earnest at that time.[4] In July, 2004, Todd began having problems with Lafayette which culminated in the termination of its subcontract on August 20.

---

[3]Submittals were not submitted for the first time on December 22, as claimed by the Government. Attached is Todd's submittal log demonstrating that the majority of the submittals were furnished to the Government by January 15, 2004.

[4]The minutes from a July 1, 2004, progress meeting indicate that Lafayette had a crew of 15-20 workers on site and that the work should be finished by July 16, 2004.

Within 4 days, a new subcontractor had been hired to complete Lafayette's work -- little of which remained to be done at that point.[5]

As part of its complaint about project delays, the Government contends that Todd did not act quickly enough to resolve installation deficiencies. In early October, 2004, the parties began discussing how to resolve some warranty and other issues at the project, most notably a deficiency in the installation of the EPDM-lined valleys. On November 10, 2004, Todd submitted a proposed fix which it intended to implement on November 15. The Government did not approve Todd's proposed fix (using liquid EPDM) so Todd promptly submitted an alternative (using Hydrostop) on November 16, 2004. That suggestion was rejected by the Government on November 23. At the Government's request, Todd resubmitted information on the liquid EPDM on December 3, 2004. On December 17, the Government indicated that it would likely approve the use of liquid EPDM. A few weeks later, however, it requested additional information on Hydrostop. The discussions on how best to resolve the situation continued until February 23, 2005. The problem with the EPDM-lined gutters was corrected in March, 2005.

Also in October, 2004, the Government expressed concern about rust and construction damage to the new roof panels and how those issues might affect the roof manufacturer's warranty. The Government instructed Todd to refrain from performing any repairs until a recommendation was received from the manufacturer. The issue was discussed by the parties on November 3, 2004. On November 4, the Government wrote to Todd confirming that it should not proceed with any painting or related touch-up until after the problems with the EPDM-lined valleys were corrected. As indicated above, alternative ways to address the EPDM issue were discussed by the parties from November, 2004, until an agreement was finally reached in February, 2005. After the EPDM problem was corrected, Todd concentrated its efforts on completing all remaining punch list items.

A pre-final inspection list was generated on May 9, 2005. Touch-up painting was scheduled to begin on May 26. On May 27, 2005, Todd faxed a proposed painting procedure to the Government which included a letter from the roof manufacturer. On May 31, the Government again advised Todd that it should refrain from performing any touch-up or painting until the manufacturer's recommendation was approved by the Government. The Government questioned the adequacy of Todd's painting procedure and the manufacturer's letter on June 1, 2005. On June 21, the Government notified Todd that a similar situation had been encountered at Pope AFB and that the painting procedure used on that job would be forwarded to Todd. On June 23, the Government again instructed Todd to refrain from performing any touch-up or painting work on the roof. On July 7, 2005, the parties met at the job site and, after walking the entire roof, the Government authorized Todd to proceed with the touch-up and painting work. On July 19, 2005, however, the Government again questioned Todd's painting procedure. After about an hour and a half of phone calls, the Government agreed that the procedure was proper and within the manufacturer's guidelines. The project was officially accepted by the Government on September 30, 2005.

---

[5]The Government acknowledged in a letter dated August 20, 2004, that work on the project should be completed within 10 days.

There were many factors contributing to the length of time it took to correct the installation deficiencies noted in October, 2004. It must be remembered that this facility was occupied during the entire project and that the vast majority of the work was completed in August, 2004. Significantly, there is not a single letter after November, 2004, in which the Government notifies Todd that it is at risk of receiving an unsatisfactory performance evaluation because of perceived delays in correcting its subcontractor's installation problems.

C. Quality Control

The Government cites several quality control issues in support of its unsatisfactory rating. Those include: rust on roof panels, damage to roof panels, a failure to hold Todd's subcontractor responsible for quality problems, out of sequence work, field painting damaged panels without approval, and voiding a manufacturer's warranty. It is difficult to respond to each item since the Government is not specific in its allegations and has not provided any supporting documentation. It is important to emphasize that the Government never advised Todd that any of these conditions, if not immediately resolved, would result in a final unsatisfactory performance evaluation. While it is true that there was rust and damage to some roof panels, there is no basis for the Government's assertion that Todd did not hold Lafayette responsible -- it terminated Lafayette's subcontract for default! Moreover, Todd never field painted damaged panels without the Government's approval and the manufacturer's warranty remains in full force and effect.[6] It is also untrue that out of sequence work caused roof leaks. The leaks were on the existing roof! Nevertheless, Todd offered to replace ceiling tiles and insulation at its own expense. The Government accepted its offer, acknowledging that the roof leaks, at least in part, resulted from existing conditions.

III. BUILDING 3611

A. Project Schedule And Submittals

Upon receiving an RFP from the Government, Todd immediately solicited bids from interested subcontractors. On September 12, 2003, a price quote for the roof work was received from Commercial Siding And Maintenance Co., Inc. ("CSM"). CSM's proposal was utilized by Todd in preparing its bid to the Government. A notice to proceed was issued to Todd on September 28, 2003, establishing an original contract completion date of March 26, 2004. Todd's first-tier subcontractor, Southwind Construction Co. ("Southwind"), immediately notified all subcontractors (including CSM) of the need to execute written subcontracts and requested submittals from the subcontractors.

Submittals were discussed at the January 12, 2004, Meeting of Mutual Understanding. At that point in time, Todd understood that CSM had prepared its submittals. On January 13, 2004, the Government authorized Todd to begin work.

---

[6]Attached is a copy of MBCI's April 12, 2006, memo confirming that its warranty is in full force and effect.

On January 20, 2004, CSM advised Todd that it would not be providing submittals in the near future. Two weeks later, CSM advised Southwind and Todd that it would not execute a subcontract or proceed with work at the project. Within one week, another contractor, Lafayette Construction Co., Inc. ("Lafayette"), was hired to begin work on the required submittals and to complete CSM's work. A subcontract was executed with Lafayette on February 17, 2004. On February 20, 2004, Todd advised Lafayette that all submittals were due to the Government by March 1, 2004. A schedule was submitted by Todd on March 4, 2004. The schedule was rejected and resubmitted by Todd on April 2, 2004. Because of the problems with CSM, the updated schedule reflected a new completion date of June 7, 2004. The schedule was accepted by the Government on April 8. Under the circumstances, Todd acted diligently to provide a project schedule and submittals to the Government.[7]

B. Project Delays

Without question, Todd was unable to promptly start the project because of the unforeseeable problems with CSM. I might mention, however, that during the first part of 2004, there were a considerable number of rain and other weather events which likely would have impeded the ability of Todd and its subcontractors to perform work at the project. Please don't misunderstand what I am saying, I recognize that because of the replacement of CSM, the need for submittals and other issues, it was not possible for physical work to begin at the project in early 2004. However, I would be remiss if I did not point out that if CSM had honored its commitment to Todd, its work likely would have been impacted to some degree on January 5, 6, 9, 17, 18, 25, 26, 27 and 28, 2004; February 3, 6, 9, 10, 12, 14, 15, 16, 17, 18, 23, 24, 25, 26 and 27, 2004; March 6, 9, 15, 16, 18, 19, 21, 27, 28, 30 and 31, 2004; and, April 1, 2, 10, 11 and 12, 2004.

On April 12, 2004, a preparatory meeting was conducted for the demolition work to be performed by Lafayette. It rained on April 13 and 14, 2004. Demolition work began on April 15 and continued to April 19. On April 21, 2004, Lafayette discovered a differing site condition which had to be addressed before the majority of its work could proceed at the project. The Government was notified of the situation (and of a possible solution) on April 22, at which point a meeting was scheduled for April 26, 2004. On May 5, 2004, the Government advised Todd that an RFP would be issued for the additional work resulting from the differing site condition. The Government and Todd negotiated a modification on June 9, 2004, which included a 125-day extension in the contract completion date. The modification established a new completion date of July 29, 2004.

During July, 2004, every effort was made by Todd to secure stamped engineered drawings from Lafayette and its engineering consultant, Wilbur Dees, P.E. The drawings were submitted and rejected on a couple of occasions at which time it was discovered that Lafayette had fabricated the engineer's stamp. Clearly, Lafayette's actions in that regard were unforeseeable and do not cast doubt on the management or supervisory capabilities of Todd. Drawings were finally received by

---

[7]Again, there was no mention at the January 12 Meeting of Mutual Understanding that Todd's conduct in connection with the project schedules and submittals was unacceptable. Attached is a copy of Todd's submittal log demonstrating that the majority of the submittals were furnished to the Government by March 1, 2004.

Todd on August 5, 2004; submitted to the Corps for approval on August 6, 2004; and approved by the Corps on August 11. The very next day, August 12, 2004, Todd notified the Government that it was ordering steel truss support members with an anticipated delivery date of August 20.

On August 20, 2004, Lafayette's subcontract was terminated. Within 4 days (August 24), another subcontractor, F&R Construction of Fayetteville, Inc. ("F&R"), was hired to complete Lafayette's work. Installation of the truss support system started on August 26. Because of the unexpected problems on the project, Todd began requesting permission to perform work on weekends. I do not have the date of each request or the Government's response. My point, however, as it relates to the proposed performance evaluation, is that Todd made every effort to accelerate completion of the work. I would also note that there were numerous days in August, September and October, 2004, that working conditions were not ideal because of weather, Hurricane Francis, and general industry chaos resulting from the hurricane season.[8] Notwithstanding those issues, work progressed for the most part without incident through December, 2004.

On February 7, 2005, Todd notified the Government that the project should be completed within 3-4 weeks, including clean-up. In the first part of 2005, a possible deficiency in the lower roof was reported to Todd. Todd expressed its concerns to F&R, which initially took the position that the perceived deficiencies were actually an "optical illusion." On March 7, 2005, Todd notified F&R that it was delaying completion of the project. Similar letters were sent to F&R by Todd on March 25 and April 22, 2005. Todd immediately began withholding payment from F&R in an effort to ensure its timely and satisfactory completion of the project.

On April 25, 2005, the Government inspected and accepted the remedial work performed by F&R to correct the deficiencies in the lower roof. In the weeks following April 25, however, other concerns were expressed by the Government. For example, on April 27, 2005, the Government complained about the metal panel seams. The Government asked Todd to arrange for an inspection of the roof by McElroy Metals, the manufacturer of the roof system. Todd immediately arranged for the inspection, and notified the Government on May 4, 2005, that McElroy Metals believed the "crimping procedure" used by F&R was acceptable.

A pre-final inspection was conducted on May 9, 2005. Todd did everything within its power to timely complete the pre-final inspection list. On May 11, 2005, the Government notified Todd that it was concerned about the structural integrity of the lower roof and the lack of approved shop drawings. In fact, one of the Government's primary complaints in the performance evaluation is the length of time it took to correct this problem. With all due respect, the Government shares responsibility for this delay. When the issue was raised with Mr. Dees, he confirmed by letter dated May 17, 2005, that he had met with Government representatives a year earlier, shared with them his structural design, and asked them to immediately notify him of any concerns. Nothing was said until a year later -- after the work was completed by Todd! Because Mr. Dees was unavailable to promptly address the Government's concerns, Todd hired another structural engineering consultant, Dixon Associates Consulting Engineers, Inc. ("Dixon"), to inspect the project, perform engineering

[8]The Government's reliance in its negative evaluation on a 3-week materials shortage in October, 2004, is unfair, to say the least.

calculations, and, if necessary, to develop a remedial plan. Dixon proposed a method for stabilizing the truss support system. The remedial work was performed in August and September, 2005, and paid for by Todd. The project was accepted by the Government on October 5, 2005.

C. Quality Control

Without providing any specific information or supporting documentation, the Government criticizes Todd's Quality control for "allowing deficient work to be installed." Given the lack of details, it is difficult to adequately respond to the Government's statement. The record does not support an unsatisfactory performance evaluation based on Todd's failure to detect and prevent Lafayette from performing some non-conforming work. There is no indication that Todd intentionally or negligently disregarded its quality control responsibilities.

Under the circumstances, I do not believe the proposed unsatisfactory ratings are warranted. Like all prime contractors, Todd relies heavily upon subcontractors to promptly and properly perform their work. While Todd has a responsibility to manage its subcontractors, it must be recognized that the decision to terminate a subcontractor is a difficult one. Recognizing the significant impact of making such a decision, Todd exercised its best judgment in working first with Lafayette and then F&R in an effort to complete these projects in a timely manner. It is significant that Todd "stayed the course," even to the extent of suffering out of pocket losses on these projects (between liquidated damages and completion/corrective costs) approaching $400,000. Moreover, despite the problems with subcontractors, the Government had the use and occupancy of these buildings at all times. In short, Todd does not deserve the lowest available rating on its performance evaluations. I have enclosed a copy of all documents supporting this appeal.

Very truly yours,

HAYES MAGRINI & GATEWOOD

s/Robert L. Magrini

Robert L. Magrini

RLM:cp
Enclosures

cc: Mr. Terry G. Peters, Via E-mail only, Terry.G.Peters@sas02.usace.army.mil
Mr. Stephen T. Blanchard, Via E-mail only, Stephen.T.Blanchard@sas02.usace.army.mil
Ms. Karen J. Donald, Via E-mail only, Karen.J.Donald@sas02.usace.army.mil
Mr. George Todd, Via E-mail only, gtodd@coxinet.net
Mr. Tom LaGalle, Via E-mail only, tom.lagalle@toddlp.net

No enclosures sent via e-mail

todd.gen\protest letter

# SUBMITTAL REGISTER

CONTRACT NUMBER: DACA21-03-D-0021-0004

TITLE AND LOCATION: Repair Roof, Bldg. 2121 Seymour Johnson AFB

CONTRACTOR: TODD CONSTRUCTION COMPANY, Inc.

SPECIFICATION SECTION

| ACTIVITY NO | TRANSMITTAL NO: | ITEM NO | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEMS SUBMITTED | TYPE OF SUBMITTAL: DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | CERTIFICATES | SAMPLES | O&M MANUALS | CLASSIFICATION: INFORMATION | ONLY | GOVERNMENT | APPROVAL | REVIEWER | CONTRACTOR SCHEDULED DATES: SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | DATE | SUBMIT TO GOVERNMENT | GOVERNMENT ACTION: CODE | DATE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a | b | c | d | e | f | g | h | i | j | k | l | m | n | o | p | q | r | s | t | u | v | w | x | y | z | aa |
| | 001 | 1 | | Laydown Area | | X | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | B | 12-29-03 | |
| | 002 | 1 | Section 07213 | Batt Insulation | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | E | 12-29-03 | |
| | 002 | 2 | Section 07213 | Rigid Insulation | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | A | 12-29-03 | |
| | 003 | 1 | Section 07465 | Metal Siding | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | E | 1-05-04 | |
| | 004 | 1 | Section 07531 | EPDM | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | B | 12-29-03 | |
| | 005 | 1 | Section 07600 | Flashing & Sheet Metal | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | C | 1-05-04 | |
| | 006 | 1 | Section 07610 | SSMR | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | B | 1-05-04 | |
| | 006 | 2 | Section 07610 | Test Reports | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | C | 1-05-04 | |
| | 006 | 3 | Section 07610 | Color Chart | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | B | 1-05-04 | |
| | 007 | 1 | Section 07920 | Sealants | X | | | | | | | | | | X | | | | | | GA | 12-18-03 | 12-18-03 | B | 1-05-04 | |
| | 008 | 1 | Section 07610 | Panels & Accessories | | | | | | | X | | | | X | | | | | | GA | 1-14-04 | 1-15-04 | C | 1-23-04 | |
| | 009 | 1 | Section 07600 | Shop Drawings | | X | | | | | | | | | X | | | | | | GA | 1-22-04 | 1-23-04 | B | 2-05-04 | |
| | 010 | 1 | Section 07610 | Shop Drawings | | X | | | | | | | | | X | | | | | | GA | 1-22-04 | 1-23-04 | B | 2-05-04 | |
| | 010 | 2 | Section 07610 | Design Calculations | X | | | | | | | | | | X | | | | | | GA | 1-22-04 | 1-23-04 | B | 2-05-04 | |
| | 011 | 1 | Section 07610 | Batt Insulation | | | | | | | X | | | | X | | | | | | GA | 1-22-04 | 1-23-04 | B | 2-04-04 | |
| | 012 | 1 | | Schedule | | | | X | | | | | X | | | | | | | | FIO | 2-06-04 | 2-06-04 | | | |
| | 13 | | | Submittal Reg | | | | | | | | | X | | | | | | | | FIO | 2-19-04 | 2-19-04 | | | |
| | 14 | | | Activity | | | | | | | | | X | | | | | | | | FIO | 2-19-04 | | | | |
| | 15 | | | | | | | | | | | | | | | | | | | | | | | | | |

07/19/06 WED 11:56 [TX/RX NO 9628]

**SUBMITTAL REGISTER** (ER 415-1-10)

TITLE AND LOCATION: TO#03-Repair ALS Roof, Building 3811,Seymour Johnson AFB, NC — DATE: 16 Jun 2004

CONTRACTOR: Todd Construction Co., Inc. — CONTRACT NUMBER: DACA21-03-D-0021 0003

| ACTIVITY No. | TRANS-MITTAL No. | ITEM No. | SPEC PARAGRAPH No. | DESCRIPTION OF SUBMITTAL | TYPE OF SUBMITTAL | CLASSIFICATION FIO or GA | REVIEWER OFFICE | REVIEWER NAME | CONTRACTOR SCHEDULE DATES: SUBMIT NEEDED BY | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | CORPS RECEIVED DATE | GOVERNMENT ACTION: CODE | CORPS RETURNED DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SECTION - 01000** | | | **General** | | | | | | | | | | | | |
| | 1 | 1 | 01000 1.12 | Proposed Laydown Area | PRECON SUBMTL | GA | RO | Allen | | | | A | 22 Dec 03 | A | 05 Jan 04 |
| | 2 | 2 | 01000 | Submittal Register | SUBMITTAL REG | FIO | RO | Allen | | | | | 20 Feb 04 | | 18 Mar 04 |
| | 3 | 3 | 01000 | Activity Hazard Analysis | SAFETY PLAN | FIO | RO | Allen | Resubmit | | | | 20 Feb 04 | F | 16 Mar 04 |
| | 4 | 4 | 01000 | Schedule | SCHEDULES | FIO | RO | Allen | Req't from office | | | | 05 Mar 04 | E | 17 Mar 04 |
| **SECTION - 05310** | | | **Metal Deck** | | | | | | | | | | | | |
| | 1 | 1 | 05310 2.A. | Metal Deck | PRODUCT DATA | FIO | RO | Allen | | | | | 23 Jan 04 | E | 05 Feb 04 |
| | 2 | 2 | 05310 A.1. | Metal roofing shop drawings | SHOP DRAWINGS | FIO | RO | Allen | | | | | 23 Jan 04 | C | 05 Feb |
| | 3.1 | 3 | 05310 1.A. | Product Data | PRODUCT DATA | GA | RO | | | | | | 20 May 04 | A | 20 May 04 |
| | 3.1 | 4 | 05310 1.A.1. | Shop Drawings SDI Commentary | PRODUCT DATA | GA | RO | | | | | | 20 May 04 | A | 26 May 04 |
| | 3.1 | 5 | 05310 1.A.2. | Product Certificates | CERTIFICATES | GA | RO | | | | | | 20 May 04 | A | 20 May 04 |
| **SECTION - 05400** | | | **Cold-Formed Metal Framing** | | | | | | | | | | | | |
| | 1 | 1 | 05400 2.A. | Framing | PRODUCT DATA | FIO | RO | Allen | | | | | 23 Jan 04 | E | 05 Feb 04 |
| | 2 | 2 | 05400 1.B.1. | Metal Framing Shop Drawings | SHOP DRAWINGS | FIO | RO | Allen | | | | | 23 Jan 04 | E | 05 Feb 04 |
| | 3 | 3 | 05400 1.B. | Product Data | PRODUCT DATA | FIO | RO | Allen | | | | | 01 Mar 04 | F | 11 Mar 04 |
| | 3 | 4 | 05400 1.B.1. | Shop Drawings, not stamped | SHOP DRAWINGS | FIO | RO | Allen | | | | | 01 Mar 04 | E | 11 Mar 04 |
| | 3 | 5 | 05400 1.B.2. | Structural Analysis-Design Parameters | CALCULATIONS | FIO | RO | Allen | | | | | 01 Mar 04 | E | 11 Mar 04 |
| | 4 | 6 | 05400 1.B.1. | Shop Drawings | SHOP DRAWINGS | FIO | RO | Allen | | | | | 24 Mar 04 | C | 30 Mar 04 |
| | 4 | 7 | 05400 1.B.2. | Structural Analysis | CALCULATIONS | FIO | RO | Allen | | | | | 24 Mar 04 | C | 30 Mar 04 |
| | 4 | 8 | 05400 1.B. | Product Data | PRODUCT DATA | FIO | RO | | | | | | 24 Mar 04 | C | 30 Mar 04 |
| | 5 | 9 | 05400 1.B.1. | Shop Drawings | SHOP DRAWINGS | FIO | RO | Allen | | | | | 08 Apr 04 | B | 12 Apr 04 |
| | 5 | 10 | 05400 1.B.2. | Structural Analysis | CALCULATIONS | FIO | RO | Allen | | | | | 08 Apr 04 | B | 12 Apr 04 |
| | 5 | 11 | 05400 1.B. | Product Data | PRODUCT DATA | FIO | RO | Allen | | | | | 08 Apr 04 | B | 12 A |
| | 6 | 12 | 05400 1.B.1. | Shop Drawings, Low Roof | SHOP DRAWINGS | FIO | RO | Allen | | | | | 13 Apr 04 | C | 13 Apr |
| | 8 | 13 | 05400 1.B.2 | Structural Analysis, Low Roof | CALCULATIONS | FIO | RO | Allen | | | | | 13 Apr 04 | E | 13 Apr 04 |
| 0001 | 7 | 14 | 05400 | Knee wall attachment detail | SHOP DRAWINGS | GA | RO | | Resubmitted | 6/15/04 | | | 25 May 04 | C | 20 May 04 |
| **SECTION - 06105** | | | **Miscellaneous Carpentry** | | | | | | | | | | | | |
| | 1T | 1 | 06105 1.A.1. | Product Data | PRODUCT DATA | FIO | RO | | | | | | 20 May 04 | A | 28 May 04 |
| **SECTION - 07531** | | | **EPDM Membrane Roofing** | | | | | | | | | | | | |
| | 1 | 1 | 07531 1.2.A. | Product Data | PRODUCT DATA | FIO | RO | Allen | | | | | 01 Mar 04 | B | 11 Mar 04 |
| | 1 | 2 | 07531 1.2.B. | Maintenance Data | O&M DATA | FIO | RO | Allen | | | | | 01 Mar 04 | A | 11 Mar 04 |
| **SECTION - 07600** | | | **Flashing and Sheet Metal** | | | | | | | | | | | | |
| | 1 | 1 | 07600 1.2.B. | Flashing & Sheet Metal Shop Dwgs. | SHOP DRAWINGS | FIO | RO | Allen | | | | | 23 Jan 04 | E | 05 Feb 04 |
| | 2 | 2 | 07600 1.2.A. | Product Data | PRODUCT DATA | FIO | RO | Allen | | | | | 01 Mar 04 | E | 11 Mar 04 |
| **SECTION - 07610** | | | **Standing Seam Metal Roofing** | | | | | | | | | | | | |

RANGE: ALL — SORT: SECTION & ITEM



07/19/06 WED 14:30 [TX/RX NO 9634]

# SUBMITTAL REGISTER (ER 415-1-10)

TITLE AND LOCATION: TO#03-Repair ALS Roof, Building 3611, Seymour Johnson AFB, NC | DATE: 27 Apr 2005

CONTRACTOR: Todd Construction Co., Inc. | CONTRACT NUMBER: DACA21-03-D-0021 0003

| ACTIVITY No. | TRANSMITTAL No. | ITEM No. | SPEC PARAGRAPH No. | DESCRIPTION OF SUBMITTAL | TYPE OF SUBMITTAL | CLASSIFICATION FIO or GA | REVIEWER OFFICE / NAME | CONTRACTOR SCHEDULE DATES: SUBMIT NEEDED BY | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | CORPS RECEIVED DATE | GOVERNMENT ACTION: CODE | CORPS RETURNED DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SECTION - 07610** | | | | **Standing Seam Metal Roofing** | | | | | | | | | | |
| | 1 | 1 | 07610 1.3.A. | Ultra Seam US-200 2" SSMR Panel Info | PRODUCT DATA | GA | | | | | | 15 Jan 04 | B | 23 Jan 04 |
| | 1 | 2 | 07610 1.3.A. | Ultra Seam Color Chart | COLOR SAMPLE | GA | | | | | | 15 Jan 04 | B | 23 Jan 04 |
| | 1 | 3 | 07610 1.3.A. | UL 90 Rated Clip Information | PRODUCT DATA | GA | | | | | | 15 Jan 04 | B | 23 Jan 04 |
| | 1 | 4 | 07610 1.3.A. | Clip Fastener Information | PRODUCT DATA | GA | | | | | | 15 Jan 04 | B | 23 Jan 04 |
| | 1 | 5 | 07610 1.6.A. | Sample Warranty, Weather Tightness | WARRANTIES | FIO | | | | | | 15 Jan 04 | F | 23 Jan 04 |
| | 1 | 6 | 07610 1.6.A. | Sample Warranty, Fluropon Coating System | WARRANTIES | FIO | | | | | | 15 Jan 04 | F | 23 Jan 04 |
| | 2 | 7 | 07610 2.2.C.8. | Composite Polyisocynaurate Roof Insul. | PRODUCT DATA | FIO | | | | | | 23 Jan 04 | B | 05 Feb 0 |
| | 3.1 | 8 | 07610 1.2.B. | Standing Seam Met. Roofing Shop Dwgs. | SHOP DRAWINGS | FIO | RO | | | | | 09 Feb 05 | A | |
| | 4.1 | 9 | 07610 1.3.A. | Product Data | PRODUCT DATA | FIO | RO | | | | | 20 Sep 04 | C | 24 Sep 04 |
| | 4.2 | 10 | 07610 1.3.C. | Samples | SAMPLES | FIO | RO | | | | | 04 Oct 04 | A | 08 Oct 04 |
| | 4.1 | 11 | 07610 1.3.D. | Design Calculations | CALCULATIONS | FIO | RO | | | | | 20 Sep 04 | E | 24 Sep 04 |
| | 4.1 | 12 | 07610 1.3.E. | Test Reports | TEST REPORTS | FIO | RO | | | | | 20 Sep 04 | A | 24 Sep 04 |
| **SECTION - 07920** | | | | **Joint Sealants** | | | | | | | | | | |
| | 1 | 1 | 07920 1.8. | Product Data | PRODUCT DATA | FIO | | | | | | 01 Mar 04 | B | 11 Mar 04 |
| | 1 | 2 | 07920 1.8. | Test Reports | TEST REPORTS | FIO | | | | | | 01 Mar 04 | B | 11 Mar 04 |

RANGE: ALL REGISTER: MAIN REGISTER SORT: SECTION & ITEM



07/19/06 WED 14:30 [TX/RX NO 9634]

# SUBMITTAL REGISTER

CONTRACT NUMBER: DACA21-03-D-0021-~~0002~~ 0003

TITLE AND LOCATION: Repair ALS Roof, Bldg. 3611 Seymour Johnson AFB

CONTRACTOR: TODD CONSTRUCTION COMPANY, Inc.

SPECIFICATION SECTION:

| ACTIVITY NO (a) | TRANSMITTAL NO (b) | ITEM NO (c) | SPECIFICATION PARAGRAPH NUMBER (d) | DESCRIPTION OF ITEMS SUBMITTED (e) | TYPE OF SUBMITTAL: DATA (f) | DRAWINGS (g) | INSTRUCTIONS (h) | SCHEDULES (i) | STATEMENTS (j) | CERTIFICATES (k) | SAMPLES (l) | O&M MANUALS (m) | CLASSIFICATION: INFORMATION ONLY (n) | (o) | GOVERNMENT APPROVAL (p) | (q) | REVIEWER (r) | CONTRACTOR SCHEDULED DATES: SUBMIT (s) | APPROVAL NEEDED BY (t) | MATERIAL NEEDED BY (u) | CONTRACTOR ACTION: CODE (v) | DATE (w) | SUBMIT TO GOVERNMENT (x) | GOVERNMENT ACTION: CODE (y) | DATE (z) | REMARKS (aa) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 001 | 1 | | Laydown Area | | X | | | | | | | | | X | | | 12-18-03 | | | GA | 12-18-03 | 12-19-03 | A | 1-05-04 | |
| | 002 | 1 | Section 07610 | SSMR Panel | X | | | | | | | | | | X | | | 1-12-04 | | | GA | 1-12-04 | 1-14-04 | B | 1-22-04 | |
| | 002 | 2 | Section 07610 | Color Chart | X | | | | | | | | | | X | | | 1-12-04 | | | GA | 1-12-04 | 1-14-04 | B | 1-22-04 | |
| | 002 | 3 | Section 07610 | Clip Information | X | | | | | | | | | | X | | | 1-12-04 | | | GA | 1-12-04 | 1-14-04 | B | 1-22-04 | |
| | 002 | 4 | Section 07610 | Clip Fastener Tab | X | | | | | | | | | | X | | | 1-12-04 | | | GA | 1-12-04 | 1-14-04 | B | 1-22-04 | |
| | 002 | 5 | Section 07610 | Sample Warranty | | | | | X | | | | X | | | | | 1-12-04 | | | FIO | 1-12-04 | 1-14-04 | F | 1-22-04 | |
| | 002 | 6 | Section 07610 | Sample Warranty | | | | | X | | | | X | | | | | 1-12-04 | | | FIO | 1-12-04 | 1-14-04 | F | 1-23-04 | |
| | 003 | 1 | Section 05310 | Metal Deck | X | | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-04-04 | |
| | 004 | 1 | Section 05400 | Framing | X | | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-04-04 | |
| | 005 | 1 | Section 07610 | Roof Panel Insulation | X | | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | B | 2-04-04 | |
| | 006 | 1 | Section 05310 | Shop Drawings | | X | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-04-04 | |
| | 007 | 1 | Section 05400 | Shop Drawings | | X | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-04-04 | |
| | 008 | 1 | Section 07600 | Shop Drawings | | X | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-04-04 | |
| | 009 | 1 | Section 07610 | Shop Drawings | | X | | | | | | | | | X | | | 1-22-04 | | | GA | 1-22-04 | 1-22-04 | E | 2-05-04 | |

07/19/06 WED 14:30 [TX/RX NO 9634]

MBCI®
Metal Roof and Wall Systems

# MEMORANDUM

Date: April 12, 2006

To: Richard Ham
Cc: Ken Daly, Donovan Lang

From: Martin Thompson

Subject: MBCI claim 00463.008 Lafayette Construction; SJAFB Bldg 2121

---

The subject complaint has been reviewed. The complaint was submitted for rust on two of the Midnight Bronze Double Lok panels sold on MBCI orders 1439403 and 1536796. Mittal Steel, USA, Sparrows Point plant, was identified as the manufacturer of the coils MBCI used to produce the Double Lok panels sold on MBCI orders 1439403 and 1536796.

A representative from Mittal Steel, USA conducted a site inspection along with Ken Daly, Stephen Blanchard, P.E. Army Corp of Engineers, and Tom LaGalle, VP of Todd Construction, to determine the cause of the rust. See Mittal Steel, USA report attached. Mittal Steel's representative, Ned Thomas, was able to determine the rust was occurring above the paint film (Surface Rust) and was not a result of oxidation of the iron substrate below. Surface Rust is common in the construction industry and occurs when metal filings from drilling or cutting metal panels or other iron bearing particulates are not removed from the panel surface during or after installation.

Based on the inspection and subsequent report provided by Mittal Steel, USA, MBCI is able to determine the cause of the complaint is not related to Mittal Steel, USA or MBCI manufacture. Although, the origin of the surface rust cannot be identified by MBCI at this time, we know that it occurred during or after installation. Since the paint film and the metallic coating remains intact providing barrier protection for the iron substrate, the condition of this complaint does not represent of breach of MBCI's Signature® 300 panel warranty. MBCI's warranty remains effective for the balance of the original warranty term.

If you have any questions or would like to discuss this matter in detail, please call me.

Claims Dept – PO Box 692055 – Houston, TX 77269-2055 – Fax: 281-477-9668




Red Rust is formed when iron (Fe) oxidizes. The only component of MBCI's Signature® 300 panel that contains iron (Fe) is the steel substrate, illustrated above. Iron oxidizes in the presence of air and moisture. With out a breach in the paint film and the metallic coating, air and moisture are blocked from oxidizing the steel substrate. Rust occurring above the paint film, where there is no breach in the paint and metallic coating, is surface rust. The iron particulates that rust in the condition of surface rust can originate from a number of places, but are likely generated during installation or additional maintenance and repairs after installation.

# *Mittal Steel, USA*

## Sparrows Point Plant

E. Emerson (Ned) Thomas
Sr. Technical Service Engineer
6031 Wyndham Woods Dr.
Powder Springs, GA 30127

Ph: 770-424-8875
Fx: 770-424-8874
Cell: 404-403-1525
Ned.Tthomas@Mittalsteel.com

**Mr. Martin Thompson**
NCI Building Systems, Inc.
P. O. Box 38217
Houston, TX 77238-8217

**10 April 2006**

Re: NCI Building Claim # 00463.008, Todd Construction @ SJAFB Building 2121, Goldsboro, NC;
R/V: EET6109, Mittal Claim # 0414-05656-94-90-06

Dear Martin,

On Thursday, 4-6-06, the AJAFB Building 2121 was inspected in Goldsboro, NC. Present for the inspection were the following:

Stephen T. Blanchard, P.E., US Army Corps of Engineers
Tom LaGalle, VP, Todd Construction
Ken Daly, Regional Manager, MBCI
E. Emerson Thomas, Technical Service Engineer, Mittal Steel, USA

Background:

Built in 2004, the building is a large storage and maintenance area for jet engines. A complaint was registered by the Army and the Corps of Engineers that there was rust on the roof panels of this building. Photos showing rust at the base of the trapezoidal area of two panels were supplied when the complaint was entered with Mittal Steel. Material for the roof panels was produced as pre-painted Galvalume® Sheet, AZ50 coating, grade 50 at the Sparrows Point Plant.

Inspection:

Upon accessing the roof by ladder, writer asked where the condition resulting in the rust complaint was located. Mr. Blanchard pointed to the two panels adjacent to the ladder and located approximately fifteen feet from the end of the building near and to the left the large entrance door. Close observation revealed numerous small red spots occurring at the flat area of the two panels and extending out from the base of the standing seam approximately 2 ½ inches and the area extended approximately eighteen inches from the eave of the panels up the slope of the roof. The appearance of the red spots was consistent with iron particulate matter commonly caused by cutting of panels during or after installation. These particles often oxidize in the presence of moisture, causing red stains on the particles and on the surface of the paint.

Further examination was done by methodical removal of a typical red spot by scraping first the rusted area and observing the surface of the paint top coat. Once the particle and stains were removed a 30x glass was used to determine if the paint surface was broken. It was not.

To determine if there was any possibility of a void in the Galvalume® coating causing rust to form from the steel substrate and bleed out onto the surface, the paint top coat was removed down to the primer, then down to the surface of the Galvalume® coating. Again, a 30x glass was used to examine the spot. There was no void in the Galvalume coating. To be sure that this test was conclusive, a second spot was chosen and the same technique used. Again, there was no breach of the paint system or the Galvalume® coating.

Prior to, during and after the examination of the two rusty areas, writer asked several times if these were the only concerns related to the panels provided by MBCI & Mittal Steel. In each case the answer was that these two areas were the only areas of concern. Comment was made that there was some possibly similar material found earlier in the life of this roof and it was removed before causing any concern.

Conclusion:

The field observations and tests conclusively proved that the rust on the two panels of concern occurred as a result of iron particles on top of the paint that rusted in the presence of moisture. There was no indication of rust occurring from the steel substrate of the panels. No permanent damage had occurred to the paint or Galvalume® coatings. Mr. Blanchard asked what could be done to remove the rusty particles and stains. Writer stated that since there was no permanent damage, the amount of particulate matter was small and there was no significant appearance concern, the best action was to leave the areas alone. If removal was attempted now there could be damage to the paint causing greater appearance concerns.

Finally, in light of the minor conditions observed during this investigation, any warranties issued to MBCI for the pre-painted Galvalume® product on this roof supplied by Sparrows Point are still in effect and will be honored.

It has been my pleasure to assist you in this matter. Should you have further needs do not hesitate to call on me at your convenience.

Sincerely,

E. Emerson Thomas

E. Emerson Thomas

cc: M Bayne, J Eckstein, F Germani, A Lader, C McDaniels, W Page, E Witek, EETLTR040606471