HAYES MAGRINI & GATEWOOD
ATTORNEYS AT LAW

1220 N. WALKER • OKLAHOMA CITY, OK 73103
405-235-9922 • FAX 405-235-6611
RMAGRINI@HMGLAWYERS.COM

MAILING ADDRESS:
P.O. BOX 60140
OKLAHOMA CITY, OK 73146-0140

October 2, 2006

Fax No. (912) 652-5828 and
E-Mail: rita.a.miles@sas02.usace.army.mil and
VIA FEDERAL EXPRESS
Ms. Rita Miles
Department of the Army
Savannah District Corps of Engineers
100 West Oglethorpe Road
Savannah, Georgia 31402-0889

Re: Todd Construction Company, Inc.
Project No.: DACA 21-03-D-0021

Repair ALS Roof, Bldg. 3611
Project No. VKAG 99-1130
Todd Job No. 3003

Repair Roof Building 2121
Project No. VKAG 00-1165
Todd Job No. 3004

Dear Ms. Miles:

This will serve as Todd's response to the documents provided with your August 25, 2006, letter to Tom LaGalle. The documentation accompanying your letter includes the records I submitted to the Government in conjunction with our July 19, 2006, comments. In other words, it is impossible at this point to determine which documents the Government actually relied upon in issuing the proposed unsatisfactory performance evaluations. In addition, since the Government's file does not indicate which documents and comments pertain to which "elements of the rating" it is difficult for me to separately address each element. Consequently, I will follow the same format as my August 18, 2006, appeal letter. For the reasons stated in our appeal and this letter, I believe you should withdraw the evaluations altogether or revise them to indicate that Todd's performance on both jobs was "satisfactory."

## I. PROCEDURAL DEFICIENCIES

In my August 18, 2006, appeal letter, I noted several instances in which the Government departed significantly from the evaluation procedures mandated by Regulation No. 415-1-17 ("Regulation"). The documents you provided either substantiate or fail to refute that the deviations occurred and offer no justification for the Government's failure to adhere to its own regulations.

The Government is required by the Regulation to advise the contractor at the preconstruction conference of the "performance elements against which his performance will be evaluated" and to tell *him* what constitutes "satisfactory and unsatisfactory performance." A preconstruction conference was conducted on both projects in November, 2003. Todd was not told about the applicable "performance elements" or what would constitute "satisfactory or unsatisfactory

EXHIBIT
E

performance." Before issuing an interim unsatisfactory performance evaluation, the Government is required to conduct a conference with the contractor to discuss problem areas and their resolution, issue a Memorandum For Record ("MFR"), and to establish a cure period. It is only after the contractor fails to remedy its conduct that the Government then gives notice of its intent to issue an interim unsatisfactory performance evaluation. The final unsatisfactory ratings are based largely on perceived delays at the beginning of the projects.[1] Yet, the Government failed during that critical time to conduct a conference with Todd, never issued an MFR, and did not establish a cure period. Instead, more than 4 months after the issuance of notices to proceed, the Government first advised Todd that it was planning to issue unsatisfactory performance evaluations.[2] The Government's departures from the procedure mandated by the Regulation made a difference in this case. Unquestionably, Todd experienced delays at the beginning of both jobs. On one project (Building 2121) the plans provided by the Government did not comply with current code requirements. That prolonged the preparation of submittals on the metal building. On the other project (Building 3611) the initial delays were attributable to a subcontractor, Commercial Siding And Maintenance Co., Inc. ("CSM"), refusing to execute a subcontract and proceed with its work. Had the Government acted in accordance with the Regulation, then Todd could have taken steps to remedy the problems before it was too late.

It is also clear from the record that final performance evaluations were not prepared within 60 days of substantial completion, the Office of Counsel has never been involved in preparing or reviewing the documentation supporting the unsatisfactory evaluations and the final reports were not reviewed by an individual having "knowledge of the contractor's performance" at a supervisory level above that of the evaluating official. The final reports were prepared by the Resident Engineer, Stephen Blanchard, and reviewed by Contracting Officer, Karen Donald. Todd does not believe Ms. Donald has sufficient personal "knowledge of the contractor's performance." Moreover, it is evident from the Government's file that she did not review the reports for "accuracy and fairness" and made no effort to determine if the "justification and documentation supporting an unsatisfactory rating is adequate." Written comments were e-mailed to Mr. Blanchard on July 19, 2006. Mr. Blanchard advised Ms. Donald on July 20 that he recommended proceeding with issuance of the final unsatisfactory evaluations. Our July 19 comments clearly raised factual disputes that should have been resolved by Ms. Donald before issuing final reports. Nevertheless, the unsatisfactory performance evaluations were prematurely posted on CCASS on July 21. Ms. Donald did so without conducting any independent investigation and apparently after accepting as true Mr. Blanchard's July 20 comments and recommendation. Documents supporting Todd's factual statements were received by the Government on July 24, 2006. The file contains a July 24 "sticky note" from Mr. Blanchard to Ms. Donald stating, "Docs recvd on 24 July from Todd, for your file. Does not change my recommendation on unsat." It does not appear as if the documents were reviewed by Ms. Donald.

---

[1]On July 20, 2006, the Resident Engineer, Stephen Blanchard, prepared a memo responding to our July 19 comments. Simply stated, his recommendation to issue unsatisfactory reports is based on his view that Todd was 4 months late starting these projects.

[2]As indicated in our appeal letter, project schedules and submittals were discussed at length at the January 12, 2004, Meeting of Mutual Understanding with no indication from the Government that Todd's performance at that point was unacceptable.

II. BUILDING 2121

A. Project Schedule And Submittals

Although rating the "Adequacy of Submittals" as "Satisfactory," the Government contends in the evaluation that Todd failed to provide submittals in a timely manner. Again, the failure of the original plans to comply with current codes delayed preparation of the metal building submittals.[3] Nevertheless, it is evident from Todd's submittal log that most submittals were provided by December 18, 2003 (not December 22 as claimed by the Government). The Government rates as "Unsatisfactory" the "Adequacy Of Initial Progress Schedule." Todd was told at the January 12, 2004, Meeting of Mutual Understanding that project schedules were to be submitted that week. It is true that Todd did not submit an initial schedule until February 6, 2004. The initial submission was rejected, for the most part, because Todd provided a schedule that included unapproved weekend and holiday work. A revised schedule was not submitted until April 4, 2004. In the interim, however, a differing site condition was discovered by Lafayette Construction Co., Inc. ("Lafayette"), which made it impossible to proceed with significant portions of the work. The Government seems to ignore the impact this discovery had on Todd's ability to develop and resubmit a meaningful project schedule.

B. Project Delays

The vast majority of "Unsatisfactory" ratings are in the category of "Timely Performance." Once work started at the project,[4] an unforeseen condition was discovered by Lafayette. Although the documents you provided essentially support Todd's version of events, I was somewhat alarmed by Mr. Blanchard's comments to the effect that Lafayette sought a change in plans for its own convenience. That is not supported by the file records. The plans furnished by the Government depicted rigid insulation under the existing metal roof. There was actually cement board in that area, not rigid insulation. On February 25, 2004, Lafayette expressed its concerns to Todd about the unforeseen condition and suggested installing rigid insulation over the cement board. Todd immediately communicated Lafayette's concerns to the Government. Another unforeseen condition was reported by Lafayette on March 19, 2004.[5] These conditions were not the fault or responsibility of Todd or Lafayette. They remained unresolved until May 12, 2004. A modification was executed on June 9, 2004, and work proceeded in earnest thereafter. Problems with Lafayette resulted in the termination of its subcontract on August 20 at which time little work remained to be done. Within 4 days, a new subcontractor was hired to replace Lafayette.

---

[3]This is not an afterthought by Todd. On May 25, 2004, Mr. LaGalle advised Mr. Blanchard that the "original scope of work was not in compliance with current code nor accurate in detail, resulting in numerous delays to develop a best for all parties revised scope." A copy of Mr. LaGalle's letter is attached.

[4]The Government's statement in the evaluation that work did not begin until the week of March 29, 2004, is simply wrong.

[5]Copies of Lafayette's letters are attached.

As part of its complaint about project delays, the Government contends that Todd did not act quickly enough to resolve installation deficiencies. The documents establish that in early October, 2004, the parties began discussing some warranty and other issues at the project, most notably a deficiency in the installation of the EPDM-lined valleys. Todd will accept responsibility for not earlier discovering these deficiencies in Lafayette's work. However, the records clearly indicate that Todd acted diligently to resolve the problems once they were discovered. From November 10, 2004,[6] to February 23, 2005, the parties discussed various alternatives for remedying the problem with the EPDM-lined gutters. Todd did not ignore the problem -- it submitted proposed solutions to the Government and kept after the Government to select an acceptable repair method.

Until the problem with the gutters was resolved, it was not prudent to perform any touch-up painting on the roof panels. In fact, the Government acknowledged on November 4 that Todd should not proceed with any touch-up until after the problem with the EPDM-lined gutters was resolved. Once that happened, Todd concentrated its efforts on completing all remaining punch list items, including the touch-up of the roof panels. Touch-up painting was scheduled for May 26, 2004. On May 27, Todd furnished the Government with a painting protocol from the roof manufacturer. For over 6 weeks, the Government expressed unfounded concerns about the painting procedure, which it ultimately agreed to in mid-July, 2005.

Finally, a number of "Unsatisfactory" ratings are in the "Effectiveness Of Management" category, apparently relating to Todd's management of its subcontractors. Todd was not pleased with Lafayette's performance, especially with some of the issues that arose in July, 2004. Todd acted swiftly after problems arose to terminate Lafayette's subcontract and hire a replacement subcontractor.

Significantly, there is not a single letter from the Government after November, 2004, notifying Todd that it was at risk of receiving an unsatisfactory performance evaluation because of perceived delays in correcting its subcontractor's installation deficiencies.

C. <u>Quality Control</u>

The "unsatisfactory" evaluations in the "Quality Control" portion of the report seem to be based on the following issues: rust on roof panels, damage to roof panels, a failure to hold Todd's subcontractor responsible for quality problems, out of sequence work, field painting damaged panels without approval, and voiding the manufacturer's warranty. I have little to add to our appeal letter, except to say that only the existence of rust and panel damage are supported by the documentation provided with your letter. The other factual allegations are incorrect.

III. <u>BUILDING 3611</u>

A. <u>Project Schedule And Submittals</u>

The problems with CSM impacted Todd's ability to timely provide submittals or a meaningful project schedule. Again, it would have been helpful if the Government had complied with the

---

[6]The project was 98% complete on November 4, 2004. (*See:* Serial Letter No. 03-21-068.)

Regulation early in the project. Moreover, to the extent the overall unsatisfactory evaluation is based on Todd's perceived inaction in the face of subcontractor problems, it must be emphasized that once CSM announced it was not going to honor its commitment, Lafayette was hired at which time submittals and an acceptable schedule were immediately submitted to the Government.

B. Project Delays

Without question, the unexpected problems with CSM delayed the start of work. However, as it relates to the proposed performance evaluations, I think the Government ignores Todd's extraordinary efforts to replace CSM and the impact of the unforeseen condition discovered by Lafayette when it started work. The modification addressing that condition was not executed until June 9, 2004, at which time Todd was left with the task of reengineering the roof work. During July, 2004, Todd made every effort to secure stamped engineering drawings from Lafayette and its engineering consultant, Wilbur Dees, P.E. No one -- Todd or the Government -- could foresee that Lafayette was going to fabricate an engineering stamp to gain approval of the drawings. Legitimate drawings were received by Todd on August 5, 2004; submitted to the Corps for approval on August 6; and, approved by the Government on August 11. The very next day, August 12, Todd notified the Government that it was ordering steel truss support members with an anticipated delivery date of August 20. Of course, Lafayette's subcontract was terminated on August 20. Within 4 days, another subcontractor, F&R Construction of Fayetteville, Inc. ("F&R") had been hired to replace Lafayette. Installation of the truss support system started on August 26.

I will not further elaborate on the weather and general industry conditions that affected this project in August, September and October, 2004. Nothing in the documents you provided rebuts Todd's position on this issue.

I also have little to add to our appeal letter concerning the remedial work on the lower roof. I must emphasize, however, that upon discovering the problem with the "four corners of the law roof," Todd took reasonable steps to force F&R to correct the situation. On March 7, 2005, Todd notified F&R that it was delaying completion of the project. Similar letters were sent to F&R on March 25 and April 22, 2005. Todd even began withholding payment from F&R.

The final issues on the lower roof -- the lack of approved shop drawings and the Government's concerns about structural integrity -- are being disproportionately blamed on Todd, <u>at least as it relates to the "Unsatisfactory" ratings in the "Timely Performance" and "Effectiveness Of Management" sections of the final report</u>. The documents submitted by Todd demonstrate that in Spring, 2004, Mr. Dees met with Government representatives, shared with them his structural design, and asked them to notify him immediately of any concerns.[7] The Government said nothing until a year later -- after the work was completed by Todd. Mr. Dees was too busy at that time to promptly address the Government's concerns so Todd was forced to hire another structural engineering consultant, Dixon Associates Consulting Engineers, Inc. ("Dixon"). Not surprisingly, it took several weeks for Dixon to inspect the project, perform engineering calculations and develop a remedial plan. The repairs were performed in August and September, 2005. The project was accepted by the Government on October 5, 2005.

---

[7] A copy of Mr. Dees' letter is attached.

C. Quality Control

I have little to add. The documents do not demonstrate that Todd intentionally or negligently disregarded its quality control responsibilities.

The documents provided with your letter do not support unsatisfactory performance evaluations. These were difficult projects resulting in significant financial losses to Todd. Nevertheless, Todd stayed with these projects and is undeserving of the lowest rating recognized in the CCASS system.

Very truly yours,

HAYES MAGRINI & GATEWOOD

s/Robert L. Magrini

Robert L. Magrini

RLM:cp
Enclosures

cc: Mr. Terry G. Peters, Via E-mail only, Terry.G.Peters@sas02.usace.army.mil
Mr. Stephen T. Blanchard, Via E-mail only, Stephen.T.Blanchard@sas02.usace.army.mil
Ms. Karen J. Donald, Via E-mail only, Karen.J.Donald@sas02.usace.army.mil
Mr. George Todd, Via E-mail only, gtodd@coxinet.net
Mr. Tom LaGalle, Via E-mail only, tom.lagalle@toddlp.net

todd.gen\miles1.ltr