# In the United States Court of Federal Claims

No. 07-324 C
Filed July 30, 2010
TO BE PUBLISHED

| | |
|---|---|
| ) | |
| TODD CONSTRUCTION, L.P., f/k/a, ) | Challenge to performance evaluation; |
| TODD CONSTRUCTION CO., INC., ) | jurisdiction pursuant to Contract Disputes Act; |
| ) | *Christian* doctrine; provision benefitting |
| Plaintiff, ) | Government or contractor as basis for claim; |
| ) | *Freightliner Corp. v. Caldera*, 225 F.3d 1361 |
| ) | (Fed. Cir. 2000); standing to sue for procedural |
| v. ) | violations; causal connection to injury; |
| ) | redressability; failure to state a claim that |
| ) | agency abused its discretion in rating |
| THE UNITED STATES, ) | contractor's performance as "unsatisfactory" |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

Robert L. Magrini, Hayes Magrini & Gatewood, Oklahoma City, Oklahoma, for plaintiff.

Matthew H. Solomson, Trial Attorney, Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, and Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

Todd Construction filed suit in this court alleging that it had received an improper, unfair and inaccurate performance evaluation. This Court has already denied a government motion to dismiss the complaint for lack of subject matter jurisdiction, *Todd Constr. L.P. v. United States*, 85 Fed. Cl. 34 (2008) ("*Todd I*"), but indicated that it would grant the motion to dismiss for failure to state a claim unless plaintiff filed an amended complaint, *Todd Constr. L.P. v. United States*, 88 Fed. Cl. 235 (2009) ("*Todd II*").[1] Plaintiff subsequently amended its complaint

---

[1] This Opinion and Order assumes familiarity with *Todd I* and *Todd II*. Only the facts pertinent to the resolution of the present issues are set forth herein.

(docket entry 33, Aug. 14, 2009) ("Am. Compl."), alleging that (1) the Government prejudicially failed to comply with certain procedural requirements; and (2) the Government has created an inaccurate and unfair performance evaluation. The Government again moved to dismiss, making some new arguments regarding the court's jurisdiction and contending that plaintiff still fails to state a claim upon which relief can be granted. Defendant's Motion to Dismiss (docket entry 36, Oct. 13, 2009) ("Def.'s Mot."); Defendant's Supplemental Motion to Dismiss (docket entry 45, Mar. 12, 2010) ("Def.'s Supp. Mot."). The Court will **GRANT IN PART** and **DENY IN PART** the motions to dismiss for lack of subject matter jurisdiction, and **GRANT** the motion to dismiss for failure to state a claim.

## I.      Background

In *Todd II*, the Court concluded that plaintiff's original complaint failed to state a claim because (1) it requested injunctive relief that was beyond the power of the Court to provide, and (2) in any event, there were not sufficient facts set forth in the complaint to plausibly suggest an entitlement to relief. 88 Fed. Cl. at 248-49. Specifically, the three-page complaint stated only that "Todd possesses rights arising out of pertinent 'rules and regulations,'" that Todd "received unsatisfactory performance evaluations that it timely appealed," and that plaintiff was therefore entitled to relief. *Id.* at 249. The Court observed that these allegations were insufficient, particularly in light of recent Supreme Court precedent, to survive a motion to dismiss. *Id.* To afford plaintiff every opportunity to comply with pleading requirements clarified after it filed its complaint, the Court allowed plaintiff to file an amended complaint. *Id.*

In its amended complaint, Todd provides eleven pages of more detailed allegations, starting with its receipt of two task orders from the United States Army Corps of Engineers ("Corps") to work on Building 2121 and Building 3611 at the Seymour Johnson Air Force Base in Goldsboro, North Carolina. Am. Compl. ¶ 4.

### A.      Building 2121

With respect to Building 2121, the Corps gave Todd notice to proceed with its work in September 2003, although problems with the plans provided by the Corps delayed Todd's submittals and project schedule. *Id.* ¶¶ 5-6. A preconstruction meeting was held in November 2003, but Todd complains it was not advised at that meeting of the criteria that would be used in evaluation, and in January 2004 a "Meeting of Mutual Understanding" was held at which Todd was not advised that it was at risk for an unsatisfactory evaluation for delay in its submittals and schedule. *Id.* ¶¶ 6-7.

In February 2004, the Corps informed Todd that it would issue an interim unsatisfactory performance evaluation due to untimely provision of the submittals and project schedule. *Id.* ¶ 7. For reasons discussed below, it is unclear whether this criticism related to Building 2121 or the other building. But one day later, Todd submitted an accelerated schedule showing an intent to work seven days a week, which the Corps rejected two weeks later. *Id.* ¶ 8. In the same month,

Todd's subcontractor discovered a differing site condition that required a revised project schedule. *Id.* ¶ 8. Todd notified the Corps of the differing site condition in February, but the Corps did not issue a modification until June 2004. *Id.* ¶ 9.

By August of 2004, Todd's subcontractor, Lafayette Construction Co., Inc. ("Lafayette"), had substantially completed the work, but Todd terminated the subcontract for default. *Id.* ¶ 10, ¶ 11 (deficiencies in installation of valleys in the roof), ¶ 12 (rust and construction damage to new roof panels). This termination was due at least partly to the Government's complaints about the quality of Lafayette's work on Building 2121, *id.*, but also related to Lafayette's fraud on the Government with respect to Building 3611, as described below. Todd alleges that "this unforeseeable event was not caused by Todd nor was it a reflection of Todd's management or supervisory capabilities." *Id.* ¶ 10. Todd hired another subcontractor to complete the remaining work and correct deficiencies in Lafayette's work. *Id.* ¶ 10.

Todd submitted a plan to fix the installation of valleys in the roof in November of 2004, but the Corps did not decide how to approach the problem until February 2005. *Id.* ¶ 11. The problem was then corrected by March 2005. *Id.* To maintain the benefit of the manufacturer's warranty on the roof panels, the Government had instructed Todd to refrain from repairing, painting, or touching up the panels until after the roof valleys were corrected and the manufacturer had made a recommendation regarding how to proceed. *Id.* ¶ 12.

In May 2005, the Corps generated a pre-final inspection list, and Todd proposed a touch-up painting schedule that included a letter from the roof manufacturer approving the procedure. *Id.* ¶ 13. The Corps did not authorize the painting until July 2005. *Id.* The Corps accepted the project on September 30, 2005. *Id.* ¶ 14.

       *B.*     *Building 3611*

Todd states that it used a quote from subcontractor Commercial Siding & Maintenance Co., Inc. ("CSM") for its bid on Building 3611, and when it received the task order, Todd's first-tier subcontractor notified CSM and others of the need to execute written subcontracts. *Id.* ¶ 15. Todd again alleges that at the November 2003 preconstruction meeting and January 2004 "Meeting of Mutual Understanding" "[t]he Corps never mentioned any perceived problems in connection with project schedules or submittals or indicated to Todd that any unacceptable performance issues existed." *Id.* ¶ 16.

Todd again alleges that in February 2004, the Corps advised Todd that it planned to issue an interim unsatisfactory performance evaluation for untimely submission of project schedules and submittals. *Id.* ¶ 17. But on January 20, 2004, CSM had told Todd that it would not be providing submittals, and two weeks later CSM told the first-tier subcontractor it would not honor its bid or enter a subcontract to perform the work. *Id.* ¶ 18. Thus, unlike its allegations with respect to Building 2121, Todd's complaint contains no allegation that any schedule or submittal was actually provided to the Government with respect to Building 3611 before the

February 2004 meeting.  But Todd complains that "[p]rior to issuing the interim rating" the Corps did not hold a conference between Todd and the Administrative Contracting Officer ("ACO") or the Contracting Officer Representative ("COR"); nor did it issue a Memorandum for Record ("MFR") or later re-evaluate Todd's interim performance rating.  *Id.* ¶ 17.

In late February, Todd hired Lafayette to do the roof work on Building 3611.  *Id.* ¶ 18. Project submittals and a schedule were provided to the Government by March 4, 2004.  *Id.* ¶ 19. The original contract completion date was March 26, 2004.  *Id.* ¶ 15.  On April 2, the Corps rejected Todd's schedule, ultimately accepting a revised schedule with a completion date of June 7, 2004.  *Id.* ¶ 19.

Todd maintains that although CSM's refusal to honor its bid delayed the submittals and schedule, work could not have proceeded during this time because there were 40 days of inclement weather between January 5, 2004 and April 12, 2004 that "made it impossible and/or impracticable for Todd to perform any physical work during those months."[2]  *Id.* ¶ 20.

Lafayette began work on Building 3611 on April 15, 2004 and worked until April 21, when it stopped due to a differing site condition.  *Id.* ¶ 21.  The complaint is silent on what the condition was, whether this was the same condition Lafayette discovered in February with respect to Building 2121 or whether the conditions were related.  Both conditions, however, were addressed by modifications on June 9, 2004.  *Id.* ¶¶ 9, 21.

The Corps repeatedly rejected the engineering drawings, and in July 2004, "it was discovered that Lafayette had fabricated the engineer's stamp."  *Id.* ¶ 22.  Todd asserts that "[t]his unforeseeable event was not caused by Todd, nor was it a reflection of Todd's management or supervisory capabilities."  *Id.* ¶ 22.  Todd provided acceptable submittals in early August, and terminated Lafayette for default (as indicated above) on August 20, 2004.  *Id.* ¶¶ 22-23.  Todd hired another subcontractor to complete the work, and requested to work weekends, but weather conditions (including Hurricane Frances) delayed completion.  *Id.* ¶¶ 23-24.  The project was three to four weeks from being fully complete in February 2005, but at that point the Corps identified concerns with the quality of the work, including the structural integrity of the roof.  *Id.* ¶¶ 25-27.  Todd hired a second engineer, who proposed a remedial plan that Todd paid to implement.  *Id.* ¶ 27.  The Corps accepted the project on October 14, 2005.  *Id.* ¶ 28.

For both buildings, Todd maintains that during the entire job:

the building was occupied; and, the Corps never advised Todd of the performance elements against which Todd's performance would be evaluated; it never conducted any performance evaluation conferences with Todd before or after issuing its initial (and only) interim performance evaluation; it never re-evaluated

---

[2]  The Court takes judicial notice that there are 98 days between January 5 and April 12, leaving 58 days of non-inclement weather.

its initial performance rating, much less on a periodic basis throughout the
duration of the work; and, it never provided Todd with notice or an opportunity to
cure any perceived deficiencies in its performance.

*Id.* ¶¶ 14, 29.

C.    *Performance Evaluations*

On March 26, 2006, the Corps issued proposed final evaluations rating Todd's overall
performance as unsatisfactory due to Todd's (1) failing to furnish project schedules and
submittals in a timely manner; (2) failing to prosecute the work in a timely manner; and (3)
failing to timely address quality control issues.  *Id.* ¶ 29.  Pursuant to the applicable regulations,
Todd timely submitted comments to the Corps "pointing out significant problems with the
proposed unsatisfactory ratings on account of the delays which were caused by unforeseen events
many of which were neither the fault nor the responsibility of Todd."  *Id.*

On July 23, 2006, the Corps issued final performance evaluations finding Todd's
performance deficient in the following areas:

**Building 2121**
A.    Quality of Workmanship
B.    Implementation of the CQC Plan[3]
C.    Identification/Correction of Deficient Work in a Timely Manner
D.    Adequacy of Initial Progress Schedule
E.    Adherence to Approved Schedule
F.    Resolution of Delays
G.    Submission of Required Documentation
H.    Completion of Punchlist Items
I.    Submission of Updated and Revised Progress Schedules
J.    Warranty Response
K.    Cooperation and Responsiveness
L.    Management of Resources/Personnel
M.    Coordination and Control of Subcontractor(s)
N.    Effectiveness of Job-Site Supervision
O.    Review/Resolution of Subcontractor's Issues

**Building 3611**
A.    Quality of Workmanship
B.    Implementation of the CQC Plan
C.    Adequacy of Submittals

---

[3] "CQC plan" is the Contractor Quality Control plan.  *See* Engineer Regulation ("ER")
415-1-17 app. A.

      D.        Identification/Correction of Deficient Work in a Timely Manner
      E.        Adequacy of Initial Progress Schedule
      F.        Adherence to Approved Schedule
      G.        Resolution of Delays
      H.        Submission of Required Documentation
      I.        Completion of Punchlist Items
      J.        Submission of Updated and Revised Progress Schedules
      K.        Cooperation and Responsiveness
      L.        Management of Resources/Personnel
      M.        Coordination and Control of Subcontractor(s)
      N.        Effectiveness of Job-Site Supervision
      O.        Review/Resolution of Subcontractor's Issues

*Id.* ¶ 30. "Todd denies that there is sufficient evidence warranting an unsatisfactory rating for any of the identified performance elements for both Projects." *Id.*

Todd filed an appeal of the contracting officer's decision regarding these final evaluations on August 16, 2006 with Ms. Rita Miles of the Department of the Army, contending that the Corps (1) failed to notify Todd regarding the "performance elements" that would constitute "satisfactory or unsatisfactory progress"; (2) failed to hold mandated conferences with the ACO and/or the COR and Todd or issue MFRs prior to notifying Todd that interim unsatisfactory ratings were being considered; (3) failed to give Todd notice and an opportunity to cure any perceived deficiencies in its performance; (4) failed to re-evaluate Todd's performance every three months; and (5) failed to issue final performance evaluations for more than five months after final completion of the projects. *Id.* ¶ 31. In April or May 2007, the Corps issued a final decision rejecting Todd's appeal. *Compare id.* ¶ 32 *with Todd I*, 85 Fed. Cl. at 36. On May 25, 2007, plaintiff sued in this court (docket entry 1).

## II.      Motions to Dismiss for Lack of Jurisdiction

In its motion and supplemental motion to dismiss for lack of jurisdiction, defendant alleges (1) two recent decisions of the United States Court of Appeals for the Federal Circuit establish that a plaintiff may not bring a claim pursuant to the Contract Disputes Act ("CDA") founded upon regulatory violations; (2) the Engineer Regulation ("ER") governing procedures for evaluating construction contractor performance is non-binding and therefore cannot be the basis for a suit in this forum; (3) this Court lacks jurisdiction because performance evaluation regulations exist for the primary benefit of the Government; (4) Todd's contentions of procedural error should be dismissed because Todd lacks Article III standing to make those claims;[4] and (5)

---

    [4] The amended complaint again contains a contention that this Court possesses jurisdiction pursuant to the Administrative Procedure Act. Am. Compl. ¶ 3; *see also* Def.'s Mot. at 11-12. Plaintiff has already conceded, however, that this Court does not possess jurisdiction under the APA. *Todd I*, 85 Fed. Cl. at 37.

Todd's factual allegations are insufficient to survive a motion to dismiss under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Def.'s Mot. at 1-2; Def.'s Supp. Mot. at 2-5.  The Court must, of course, initially address these first four issues, which go to the "threshold matter[] of whether it has subject matter jurisdiction and whether plaintiff[] ha[s] standing to bring" its complaint.  *Magnum Opus Tech., Inc. v. United States*, ___ Fed. Cl. ___, 2010 WL 2255523, at *6 (2010).

A.      *The Court Possesses Jurisdiction to Hear CDA Suits Regarding Violations of Performance Evaluation Regulations*

In *Todd I*, the Court concluded that plaintiff could demand an accurate and fair performance evaluation prepared in accordance with procedural regulations "as a matter of right" because

> Federal regulations require that for construction contracts the "contracting activity shall evaluate contractor performance and prepare a performance report" "in accordance with agency procedures," and that the report must be "reviewed to ensure that it is accurate and fair."  FAR § 36.201.  The Corps has set forth detailed procedures to be followed in assessing contractor performance, with additional steps to be taken when the rating will be unfavorable.  Army Corps of Engineers Regulation 415-1-17(5)(c)(1).  In this case, Todd alleges that those procedures were not followed and that the evaluations it received were not, in fact, accurate and fair.  To the extent plaintiff asserts that when the Government prepares a performance evaluation that will be made part of the record upon which its future submissions will be judged, it is entitled to an accurate and fair performance evaluation prepared in accordance with the regulations, it makes that request "as a matter of right."

*Todd I*, 85 Fed. Cl. at 43 (citations omitted).

Defendant's motions to dismiss maintain that this Court was incorrect to conclude in *Todd I* that it possesses jurisdiction over challenges to performance evaluations under the CDA.  Defendant asserts that a contractor cannot make a demand for an accurate and fair evaluation "as a matter of right" because (1) the Federal Circuit has recently held that "the Government's responsibility pursuant to regulation does not translate, *ipso facto*, into contract rights that may be enforced against the Government," Def.'s Supp. Mot. at 2; and (2) that the performance evaluation regulations exist for the primary benefit of the Government and do not, therefore, create a right of action in contractors to enforce those regulations.  Def.'s Mot. at 13-15.

Courts have repeatedly addressed whether a regulation or statute creates a right enforceable against the Government.  In 1915, the Supreme Court determined that although the Government had failed to comply with a statute requiring all defense contracts to be in writing and signed, the contract was not invalid.  *United States v. New York & Porto Rico S.S. Co.*, 239

U.S. 88 (1915).  The purpose of the statute was to prevent fraud by government officers, and the court saw "no reason for extending the implication of the act beyond the evil that it seeks to prevent."  *Id.* at 93.  Thus, the contractor could not use the statute to avoid transporting coal for the contract price.  *Id.*; *see also Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000) (holding that contractor cannot use Government's failure to comply with regulation governing exercise of options to avoid providing services at contract price).

In *College Point Boat Corp. v. United States*, 267 U.S. 12, 16 (1925), the Supreme Court observed that the Government possessed an "unconditional right of cancellation" arising from a statute authorizing the president to "modify, suspend, cancel or requisition" any contract for ships or material due to emergency war requirements.  *Id.*; *see also* Urgent Deficiencies Appropriations Act, ch. 29, Pub. L. No. 65-23, 40 Stat. 182, 182 (1917).  Thus, even though the contract at issue in *College Point* did not include a cancellation clause, the right to cancel "became, by implication, one of the terms of the contract" despite neither party's awareness of the statutory term.  267 U.S. at 15.  The notion that certain legal mandates are treated as part of the contract ultimately became known as the *Christian* doctrine, named after  *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 424-26 (Ct. Cl. 1963), *motion for rehearing denied*, 320 F.2d 345 (Ct. Cl. 1963).[5]

In *Christian*, the Corps was constructing housing units at Fort Polk, Louisiana, when the Army deactivated the fort.  312 F.2d at 419.  The Corps terminated the contracts, and plaintiff sued alleging entitlement to anticipated profits due to wrongful termination.  *Id.* at 423.  The Government argued that although the contract did not contain any provision allowing a termination for convenience, the contract should be read as if the mandatory clause contained in the Armed Services Procurement Regulations ("ASPR") were included in the contract.  *Id.* at 424.  The Court of Claims held that because the ASPR were issued under statutory authority, the regulation "had the force and effect of law."  *Id.*  Thus, if those regulations applied "there was a legal requirement that the plaintiff's contract contain the standard termination clause and the contract must be read as if it did."  *Id.*  After concluding that the regulation applied to G.L. Christian's contract, the Court of Claims stated that:

---

[5]  The *Christian* doctrine exists because "[r]egulations reasonably adapted to the administration of a Congressional act, and not inconsistent with any statute, have 'the force and effect of law.'" *Christian*, 320 F.2d at 350; *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (finding federal regulations have the force and effect of law as long as they are properly promulgated and within statutory authority).  Thus, a pertinent procurement regulation is "law which governs the award and interpretation of contracts as fully as if it were made a part thereof."  *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970).  The Armed Services Procurement Regulations, along with other agencies' government contract rules, were replaced with the Federal Acquisition Regulation in 1983.  48 Fed. Reg. 42,102 (Sept. 19, 1983) (codified as amended in Title 48 of the Code of Federal Regulations).

We are not, and should not be, slow to find the standard termination article incorporated, as a matter of law, into plaintiff's contract if the Regulations can fairly be read as permitting that interpretation. The termination clause limits profits to work actually done, and prohibits the recovery of anticipated but unearned profits. That limitation is a deeply ingrained strand of public procurement policy.

*Id.* at 426; *see also Condec Corp. v. United States*, 369 F.2d 753, 757 (Ct. Cl. 1966) (finding regulatory requirement to consider late modification to bid became part of invitation for bids); *Christian*, 320 F.2d at 351 ("[I]t is important . . . that procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials, or by a concert of contractor and contracting officer. . . . Obligatory Congressional enactments are held to govern federal contracts because there is a need to guard the dominant legislative policy against *ad hoc* encroachment or dispensation by the executive.").

Thus the principal inquiry in determining whether to give a statute or regulation effect as though it were part of the contract is the purpose of the statute or regulation. *Rough Diamond Co. v. United States*, 351 F.2d 636, 640 (Ct. Cl. 1965). In *Rough Diamond*, the Court of Claims found that in enacting a statute making cotton available "at prices not in excess" of world market prices, Congress was intending to encourage the export of cotton and help the American farmer, not protect the diamond seller who sued after knowingly entering into a contract to barter diamonds for cotton at more than cotton's world market price. *Id.* at 640. Because the diamond seller was not within the "circle of beneficiaries Congress drew," the seller was "in the position of individuals affected by a statute without being granted litigable rights under it." *Id.* at 642.

Similarly, a plaintiff cannot sue upon a Department of Defense Accounting Manual that required "apportionments and reapportionments by OMB . . . before funds may be obligated" because that provision was not written to benefit a private contractor. *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1450 (Fed. Cir. 1997); *see also Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999); *Gould, Inc. v. United States*, 66 Fed. Cl. 253, 260 (2005); *Appeal of Def. Sys. Co.*, ASBCA No. 50918, 00-2 BCA ¶ 30991, 2000 WL 817080 (June 20, 2000) (rejecting Government contention that regulations requiring separate identification of foreign military sales items and special defense acquisition fund items were primarily for the benefit of the Government). Courts seek to ensure that plaintiffs do not "reap a benefit which Congress gave no indication of wanting them to have for themselves" when "[t]he beneficiaries on whom Congress focussed were another group altogether" and it would not advance the legislative goal to allow plaintiffs to sue. *Rough Diamond*, 351 F.2d at 642.

In *Chris Berg*, 426 F.2d at 314, the contracting officer asked the awardee to double-check its numbers because he suspected that it had made a mistake. After the awardee found the error, the contracting officer refused to allow it to reform the bid, insisting on either a contract at the erroneous price or rescission of the offer. *Id.* The Comptroller General and the Court of Claims both found this refusal to violate the applicable regulations. *Id.* at 315; *see also Letter from*

*Comptroller General to Stuart G. Oles*, B-163284, 1968 CPD ¶ 18, 1968 WL 2275 (Comp. Gen. Apr. 1, 1968). The Government argued that the ASPR as a whole benefitted the Government and therefore the awardee could not sue. *Chris Berg*, 426 F.2d at 317. The court rejected this contention, concluding that "[w]e do not think it possible to determine that all of ASPR was or was not made for the benefit of bidders." *Id.* ("Different parts may have different purposes."). Thus, the court found plaintiff entitled to reformation because a particular section of the regulation gave it a right to reform its bid:  "If a regulation appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons." *Id.* When the Government violates a provision of law intended to protect the contractor, the contractor "can obtain reformation and is not bound by his estoppel, acquiescence, and even failure to protest." *Applied Devices Corp. v. United States*, 591 F.2d 635, 640 (Ct. Cl. 1979) (finding that regulation requiring contracting officer to reasonably estimate certain costs in determining cancellation ceiling was for benefit of the bidder and applying *Christian*).

A disgruntled contractor may not sue upon every perceived regulatory violation. For example, in *American Electric Contracting Corp. v. United States*, 579 F.2d 602, 604 (Ct. Cl. 1978), the contractor waited until after it had completed performance to sue, alleging that the Government had failed to include a qualified products clause and seeking additional costs. Although the GAO had found that failing to include the clause was unfair competition, the court concluded that the regulation was for the benefit of the Government and indirectly for subcontractors, but not for the plaintiff, who was a prime contractor. *Id.* at 613. That is, "if the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or regulation, even if that party derives some incidental benefit from compliance with it." *Cessna*, 126 F.3d at 1451-52.

But statutes or regulations can be intended to benefit both the Government and other parties. *See, e.g.*, *Rough Diamond*, 351 F.2d at 640 (holding that provision benefitted both Government and farmers); *Mexican Intermodal Equip., S.A. v. United States*, 61 Fed. Cl. 55, 69-70 (2004) (citing cases involving provisions of benefit to both the Government and contractors or bidders). In *Freightliner*, the Federal Circuit considered a regulation requiring that the agency produce a justification before exercising a contract option where the option price was not evaluated as part of the original competition. 225 F.3d at 1364. The court concluded that this regulation was not intended to benefit the contract holder, who sued in that case for an equitable adjustment to increase the price it was paid during the option period. *Id.* at 1365. Because the purpose of the regulation was to ensure price competition, lower courts have found that an unsuccessful bidder can sue for the Government's failure to comply with the same regulation. *Magnum Opus*, 2010 WL 2255523, at *19-21; *Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 107 (2000). Where both the prospective bidder and the Government have a similar interest (*i.e.*, in price competition), then the regulation benefits both of those parties, even though it was not aimed at the option awardee. *Magnum Opus*, 2010 WL 2255523, at *19 ("The Federal Circuit's finding that FAR § 17.207(f) exists for the benefit of the Government as opposed to a contractor seeking an equitable adjustment does not mean that the regulation exists for the

benefit of the Government to the exclusion of all other potential parties.  Certainly it is possible for a regulation to exist both for the benefit of the Government and for potential competitors in different contexts.").

Given this background, defendant's first contention—based upon the recent Federal Circuit decisions in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010) and *Agredano v. United States*, 595 F.3d 1278 (Fed. Cir. 2010)—lacks merit.  These cases conclude that no breach of an implied contractual duty arises from failure to comply with a regulation that is not incorporated into the contract.  In *Precision Pine*, the Federal Circuit "decline[d] to create a whole new set of obligations—compliance with the multitude of substantive and procedural requirements" in the Endangered Species Act ("ESA") and its implementing regulations—where the timber contract at issue merely referenced the ESA without explicitly incorporating it.  596 F.3d at 826.  In *Agredano*, the court concluded that no implied warranty arose from the parties' belief that the Government "had fulfilled its regulatory duty to remove any contraband" from a vehicle before selling it; thus, plaintiff had no contractual claim to compensation for time spent in a Mexican jail after drugs were later discovered in the vehicle.  595 F.3d at 1281 ("[T]he source of any responsibility on the part of Customs to search vehicles and remove contraband is its regulatory function and a failure to adequately perform this responsibility does not provide a contractual remedy.").  In neither of these cases, however, did the regulations in question state that they applied to federal contracts such as the ones there at issue.  Contracts like the ones in *Agredano* and *Precision Pine* are subject to general regulations only when those provisions are specifically incorporated by language in the contract; that alone is sufficient to render those cases inapplicable here, where the procurement regulation makes clear that it is intended to govern plaintiff's contract.

Some FAR provisions apply to entire sets of contracts according to the terms of the regulations themselves.  *See, e.g.*, *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 635 (2004) ("The contract contains two 'Disputes' clauses—the clause set forth at FAR § 52.233-1, which is incorporated by explicit reference . . . and FAR § 8.405-7, which is applicable to all FSS contracts.").  Mandatory contract clauses—and in some cases simply mandatory regulations—"are deemed terms of the contract even if not specifically set out therein."  *SCM Corp. v. United States*, 645 F.2d 893, 904 (Ct. Cl. 1981) (ASPR provision regarding exchange of purchase information); *see also De Matteo Constr. Co. v. United States*, 600 F.2d 1384, 1391 (Ct. Cl. 1979) (Postal Contracting Manual regarding timeline for bid protest); *Moran Bros., Inc. v. United States*, 346 F.2d 590, 593 (Ct. Cl. 1965) (agency regulation allowing appeals within 60 days was at least "of equal vitality" as contract provision stating appeal was proper within 30 days).  Even when the Government has discretion under a mandatory clause, it can still be called to account for abuse of that discretion.[6]  *Torncello v.*

---

[6] Defendant argues that any violations of past performance regulations "cannot be any more injurious to Todd than a debarment."  Def.'s Mot. at 12.  Because a freestanding challenge to a debarment (*i.e.*, one not brought in connection with a bid protest) is subject to suit only in the district court pursuant to the APA, defendant asserts Todd must sue there.  *Id.*  But the

*United States*, 681 F.2d 756, 772 (Ct. Cl. 1982) ("[T]he government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations.").

There is no question that the provision the Court analyzed in *Todd I*, FAR § 36.201, is specifically, rather than merely arguably, applicable to Todd's contract. As it existed during the events in question,[7] § 36.201 mandated that for "each construction contract" for "$550,000 or more" (which Todd's contract was) a "performance report *shall be* prepared . . . *in accordance with agency procedures*." FAR § 36.201(a)(1), (2) (2008) (emphasis added); *see also id.* § (a)(4) ("The head of the contracting activity *shall establish procedures* which ensure that fully qualified personnel prepare and review performance reports.") (emphasis added); *id.* § (b) ("Each performance report *shall be reviewed* to ensure that it is *accurate and fair*.") (emphasis added); *id.* § (c)(1) ("Each performance report *shall be distributed in accordance with agency procedures*.") (emphasis added). Thus for each construction contract over the designated threshold, the regulation imposed a requirement to comply with both § 36.201 itself and the agency procedures implementing FAR § 36.201.

The Government argues that the amended complaint does not refer to § 36.201, but only ER 415-1-17, which was not promulgated as a formal regulation. *See* Def.'s Mot. at 14 n.5; Def.'s Reply at 7 (citing cases holding that Engineering Manual is not a "regulation."). Thus, defendant contends, § 36.201 is not at issue in this case. The Court disagrees. The amended complaint repeatedly asserts a right to an "accurate and fair" evaluation, and that phrasing is contained in § 36.201, not in ER 415-1-17. Thus, the Court views the amended complaint as relying upon § 36.201, and that regulation in turn requires compliance with the "agency procedures" contained in ER 415-1-17. Therefore, with respect to Todd's contract, the Government had no "implied" obligation to comply with past performance regulations and agency procedure; the requirement was quite explicit. FAR § 36.201 and the agency procedures implementing it are "mandatory" provisions specifically applicable to this contract.

---

connection between the performance evaluation and the contract is not "tangential," as it was in *Schickler v. Davis*, 10 F. App'x 944, 946-47 (Fed. Cir. 2001); *see also Schickler v. United States*, 54 Fed. Cl. 264, 272 (2002). *Cf. Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 557 (1999) ("In order to successfully raise the debarment issue in this Court, Medina must be able to demonstrate that it has been damaged in some way related to the contract."); *Sterlingwear of Boston, Inc. v. United States*, 11 Cl. Ct. 517, 521 (1987) (finding jurisdiction over debarment under implied contract to fully and honestly consider plaintiffs' bid). The Court possesses jurisdiction under the CDA not due to the extent of the injury to plaintiff, but because unlike debarment, the relationship between the performance evaluation requirements and Todd's contract is specific, rather than tangential.

[7]  The regulation was amended in July 2009, and no longer contains the language analyzed here. 74 Fed. Reg. 31,560 (July 1, 2009). The Court considers here only the version of FAR § 36.201 that was in effect at the time of the alleged improprieties.

Furthermore, the regulation requiring fair and accurate performance evaluations reflects a significant procurement policy that is aimed at both the Government and the individual contractor.  Agencies have been required to prepare performance evaluations for some time.  *See e.g.*, 48 Fed. Reg. 42,102, 42,357 (Sept. 19, 1983) (inserting FAR § 36.201, including requirement that "[e]ach performance report shall be reviewed to ensure that it is accurate and fair.").   The Office of Federal Procurement Policy ("OFPP") produced a policy letter acknowledging that "[s]everal agencies have established policies and procedures for collecting, recording and using past performance information," and further that "[t]hese practices are extremely important to both the Government and to contractors, and requirements are necessary to help ensure their integrity and fairness."  *See* Policy Letter 92-5, 58 Fed. Reg. 3573, 3575 (Jan. 11, 1993).

In 1994, Congress instructed the OFPP to "prescribe for executive agencies guidance regarding consideration of the past contract performance of offerors in awarding contracts." Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 1091, 108 Stat. 3243, 3272 (1994) ("FASA").  FASA states that "[p]ast contract performance of an offeror is one of the relevant factors" in award of government contracts.  *Id.*  After FASA, partly in response to contractors' concerns, the FAR was amended to include procedures to help ensure the accuracy and fairness of these evaluations.  *See* 62 Fed. Reg. 51,224, 51,226 (Sept. 30, 1997) (noting that to address the concerns of "especially the small business community" that they "might be excluded from a competition on the basis of incorrect past performance information that they have not had the opportunity to address," the final rule required that prior to exclusion from the competitive range, the offeror "shall be granted the opportunity to explain situations that contributed to an adverse past performance rating to which they have not had a previous opportunity to respond").  The OFPP further believed that "suits [might] occasionally arise" challenging past performance ratings.  OFPP, *Best Practices for Collecting and Using Current and Past Performance Information* at 6 (May 2000), available at http://gsa.gov/graphics/fas/ Best_Practice_for_PP.pdf ("Best Practices").

Thus, a significant goal of the past performance evaluation regulations is to ensure the accuracy and fairness of the evaluation, which requires conferring rights upon the contractor to, among other things, review and comment upon the evaluations.  FAR § 36.201; OFPP, *Best Practices* at 6; *White Paper: Past Performance*, prepared for the General Services Administration, December 1997, available at https://www.acquisition.gov/sevensteps/library/ ASIwp-past-perform.pdf.  In fact, the GAO has recently cited "lack of confidence in the objectivity of past performance information" in addition to failures of government employees to properly complete evaluations as hindering the Government's goal of utilizing past performance information in source selection.   GAO, *Better Performance Information Needed to Support Agency Contract Award Decisions* at 3 (April 2009) ("[F]or past performance information to be meaningful in contract award decisions, it must be documented, relevant and reliable.").  As concluded in *Todd I* and *II*, Todd  may "as a matter of right" challenge its performance evaluation as inaccurate and unfair, although it can only succeed on that claim if the Corps has abused its broad discretion.  *See also BLR Group of Am., Inc. v. United States*, 84 Fed. Cl. 634,

641 (2008). It would not advance the legislative goal to allow contracting officers to abuse their discretion by entering arbitrary and capricious performance evaluations into government-wide databases to be preserved for years. To the contrary, permitting contractors to challenge arbitrary evaluations would assist in creating reliable evaluation histories. *Rough Diamond*, 351 F.2d at 642.

Because FAR § 36.201 and the agency procedures implementing it "define and state the rights of" contractors who are being evaluated, they are "presumptively intended to benefit" contractors, even if they also benefit the Government. *Chris Berg*, 426 F.2d at 317. The contractors are not "incidental" beneficiaries, such as they would be if the regulation pertained to internal reallocation of funds in an agency. *Cessna*, 126 F.3d at 1451-52. Therefore, contractors possess rights capable of enforcement if the regulation is violated. *See Labarge Prods., Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995).

In fact, former Chief Judge Smith has already found that ER 415-1-17 confers sufficient rights upon the contractor to support a bid protest. *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212 (2001). In that case, Judge Smith found a clear violation of the procedural requirements of ER 415-1-17, but concluded that "the plaintiff was not prejudiced by this regulatory failure because the [agency] would have reached the same" result notwithstanding the failure. *Id.* at 215. As is more fully set forth in the next section, plaintiff in this case has likewise failed to allege prejudice resulting from the purported regulatory error.

The Court therefore concludes that the FAR provision applicable to this case, which requires an "accurate and fair" performance evaluation, and the procedures implementing it reflect a significant procurement policy and are intended to benefit both the Government and the contractors being evaluated. The Court rejects defendant's arguments to the contrary, and therefore **DENIES** defendant's motions to dismiss for lack of subject matter jurisdiction to the extent that they rest upon those arguments.

B.    *Plaintiff Fails to Allege Any Causal Connection Between the Alleged Procedural Violations and Its Injury and Therefore Lacks Standing to Sue for Procedural Flaws*

In *Todd II*, the Court viewed the regulations at issue "as creating two distinct sets of requirements," that is, (1) the requisite procedures (*e.g.*, proper notices and forms), and (2) the necessity for an "accurate and fair" performance evaluation. 88 Fed. Cl. at 246-47. In that case, the Court found that compliance with the procedural requirements would be reviewed *de novo*, while the accuracy and fairness of an evaluation would be reviewed only for abuse of discretion. *Id.* at 246-48. The Court again finds it useful to analyze the alleged failures to comply with procedural requirements separately from the asserted failure to produce an "accurate and fair" evaluation.

With respect to violations of required procedures, Todd's amended complaint alleges only failures to comply with ER 415-1-17. Am. Compl. ¶¶ 31-34. Defendant contends that even if plaintiff has a legally protected interest in compliance with the regulatory procedures in ER 415-1-17 (which it disputes), plaintiff fails to satisfy the second prerequisite of Article III standing, namely alleging "a causal connection between the injury and the conduct complained of."[8] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendant further maintains that any alleged error lacks redressability; that is, it is not "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (citation and quotations omitted). Standing is a jurisdictional requirement, so a plaintiff's failure to establish standing "precludes a ruling on the merits." *Media Techs. Licensing, LLC v. Upper Deck Co.,* 334 F.3d 1366, 1370 (Fed. Cir. 2003).

Procedural errors do not confer standing when there is no discernible injury to the plaintiff from the error. *Cf. Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375 (Fed. Cir. 2009) (concluding in bid protest case that Government error in accepting bids via email did not confer standing when plaintiff's fate would not have changed in the absence of the error; thus, there was no harm specific to plaintiff and no prejudice). Plaintiff's complaint and briefing in defense of its complaint confuse the issue of procedural regularity with the question whether the evaluation was "accurate and fair." That is, plaintiff maintains that "[b]ecause the Corps did not fairly and accurately follow the correct procedures for conducting performance evaluations . . . Todd has suffered a very substantial and real harm—it is now placed in an unequal (worse) position to compete for federal contracts as a result of the incorrect evaluations." Plaintiff's Objection to Defendant's Motion to Dismiss at 4 ("Pl.'s Resp.") (docket entry 39, Jan. 12, 2010). The amended complaint contains no factual allegations tying any specific procedural flaw to a particular error in the ultimate evaluation. Assuming *arguendo* that the evaluation is in fact incorrect, plaintiff's complaint asserts only that the Corps abused its discretion in issuing an "unfair and inaccurate" evaluation, not that procedural flaws caused any error.

Violations of procedural regulations must be remediable to be pursued in this court (as in Article III courts), and plaintiff's complaint does not contend that the procedural improprieties themselves injured plaintiff—only that a flawed process ultimately resulted in a substantive evaluation with which plaintiff disagrees.[9] Like the plaintiff in *Labatt*, even accepting all the

---

[8] Although courts established under Article I are not bound by the "case or controversy" requirement of Article III, *Zevalkink v. Brown*, 102 F.3d 1236, 1243 (Fed. Cir. 1996), the Court of Federal Claims applies Article III justiciability doctrines for prudential reasons. *See id.*; *Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 677 n.5 (2002). These doctrines include, among others, ripeness, standing, mootness, and political question. *Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005).

[9] Plaintiff does not contend, for example, that if it had been notified of its deficient performance earlier, it was prepared to take immediate corrective action, and if that action had been taken then the performance evaluation would have been different. The Court does not

allegations in Todd's amended complaint as true, there is no basis to conclude that if the Government had perfectly complied with the procedural regulations Todd's fate would have been any different.  Thus there is no "likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Todd therefore lacks standing to pursue that relief.  *Allen v. Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."); *Perkins v. Lukens Steel*, 310 U.S. 113 (1940) (concluding that to have standing companies had to show injury to an interest of their own, rather than to a public interest in Government's complying with the law).

Plaintiff contends that defendant (1) failed to notify Todd regarding the "performance elements" that would constitute "satisfactory or unsatisfactory progress"; (2) failed to hold mandated conferences with the ACO and/or the COR and Todd or issue MFRs prior to notifying Todd that interim unsatisfactory ratings were being considered; (3) failed to give Todd notice and an opportunity to cure any perceived deficiencies in its performance; (4) failed to re-evaluate Todd's performance every three months; and (5) failed to issue final performance evaluations for more than five months after final completion of the projects.  Am. Compl. ¶ 31.  As to the notification of elements, the Court observes that the FAR, of which plaintiff has constructive notice, defines "past performance information" to include the items upon which plaintiff was evaluated.  *See, e.g.*, FAR § 42.1501 (observing that definition includes "the contractor's record of conforming to contract requirements and to standards of good workmanship; the contractor's record of forecasting and controlling costs; the contractor's adherence to contract schedules, including the administrative aspects of performance; the contractor's history of reasonable and cooperative behavior and commitment to customer satisfaction; the contractor's reporting into databases . . .; the contractor's record of integrity and business ethics, and generally, the contractor's business-like concern for the interest of the customer.").  More importantly, however, there is no link in the amended complaint between any of these alleged failures and Todd's assertion that it received an inaccurate and unfair evaluation.

The Court therefore **GRANTS** defendant's motion pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") to dismiss plaintiff's contentions of procedural irregularities for lack of standing because plaintiff makes no allegation that the asserted errors caused plaintiff's injury.

## III.     Motion to Dismiss for Failure to State a Claim Upon Which Relief can be Granted

The remainder of plaintiff's amended complaint alleges facts it contends support the conclusion that the agency abused its discretion in issuing Todd an inaccurate and unfair evaluation of "unsatisfactory."  In *Todd II*, this Court found that although the assignment of a

---

opine on the sufficiency of such an allegation, but in the absence of that, or some similar contention, plaintiff has plainly failed to allege a causal connection between harm it has suffered and any procedural violation.

particular evaluation rating under FAR § 36.201 is within the agency's discretion, "the exercise of that discretion must be reasonable. Thus, the court will review the 'accuracy' and 'fairness' of such a performance evaluation rating to determine whether 'the discretion employed in making the decision is abused, for example, if the decision was arbitrary or capricious.'" *Todd II*, 88 Fed. Cl. at 248 (quoting *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 859-60 (Fed. Cir. 1997)). But taking all of plaintiff's assertions as true, the facts alleged would not support any such finding, and thus the defendant's motion pursuant to RCFC 12(b)(6) to dismiss the portion of the amended complaint alleging that the agency's "unsatisfactory" ratings were an abuse of discretion will be **GRANTED**.

      A.     *Standard of Review*

When ruling on a motion to dismiss for failure to state a claim upon which relief can be granted under RCFC 12(b)(6) (which is construed in accord with Rule 12(b)(6) of the Federal Rules of Civil Procedure), a court must limit its consideration to the complaint, the written instruments attached to it as exhibits, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In determining the merits of the motion, a court must "accept all factual allegations in the complaint as true." *Id.* However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

The court must determine whether the well-pled facts "'state a claim to relief that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citation omitted). As the United States Supreme Court explained:

> The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.* at 1949 (quotation marks and internal citations omitted) (quoting *Twombly*, 550 U.S. at 557). When a court considers the range of possible interpretations of the defendant's alleged conduct, if the "more likely explanations" involve lawful, non-actionable behavior, the court should find that the plaintiff's claim is not plausible. *Id.* at 1950-51.

When a plaintiff alleges an abuse of discretion such as the creation of an arbitrary or capricious performance evaluation, then the allegations of fact must give rise to a plausible inference of arbitrariness.  If the facts as pled, taken as true, do not support a finding of arbitrariness, plaintiff fails to state a claim.  *Anderson v. The Bakery and Confectionery Union*, 654 F. Supp. 2d 267 (E.D. Pa. 2009) (plaintiff alleged that differently situated employees were treated differently, which did not state a claim for arbitrary treatment); *McDaniel v. Denver Lending Group, Inc.*, No. 08-2617, 2009 WL 1873581, at *9 (D. Colo. June 30, 2009) ("[N]one of the alleged conduct . . . provides a sufficient factual basis to plausibly state a claim that Defendant acted dishonestly or abused its discretion in violation of the implied covenant of good faith and fair dealing . . . ."); *see also Johnson v. Wells*, 566 F.2d 1016, 1017 (5th Cir. 1978) ("[T]he mere statement in a complaint that [an agency] has taken arbitrary and capricious action is not sufficient to state a claim . . . .  The applicant must set forth specific facts that would, if proved, warrant the relief he seeks."); *Keco Indus. v. United States*, 492 F.2d 1200, 1207-08 (Ct. Cl. 1974) (faulting plaintiff for failure to plead actions alleged to be arbitrary and capricious with specificity).

      B.      *Todd's Factual Allegations Do Not Plausibly Suggest Entitlement to Relief*

Todd alleges that it provided some submittals on time, but not others.  Am. Compl. ¶¶ 5-6, 8, 17-18.  It discusses various Government delays and the discovery of two unspecified "differing site conditions" as delaying the schedules it did submit which, accepting the allegations of the complaint as true, were not its fault.  *Id.* ¶¶ 9, 21.  But Todd concedes that the Government complained about the quality of subcontractor Lafayette's work, which it asserts was "unforeseeable" and not "a reflection of Todd's management or supervisory capabilities."  *Id.* ¶¶ 10, 11.  It further concedes that it failed to discover that CSM refused to perform at the bid price for several months after it had received the award and after submittals were due.  *Id.* ¶¶ 15-18.  Todd then hired Lafayette to do the work, and after the Government had repeatedly rejected Lafayette's engineering drawings "it was discovered" (by whom we do not know) that Lafayette had submitted a fraudulent engineer's stamp.  *Id.* ¶ 22.  Todd again asserts that this was "unforeseeable" and not "a reflection of Todd's management or supervisory capabilities."  *Id.* ¶ 22.  Todd makes assertions that are questionable on their face regarding its inability to proceed due to inclement weather.  *Id.* ¶ 20.  Given these facts as alleged by plaintiff, it is somewhat surprising that Todd now maintains it was unaware of the "perceived deficiencies in its performance."  *Id.* ¶¶ 14, 29.

Todd's statements regarding its lack of responsibility for its subcontractors are legal conclusions, not facts, and are inconsistent with the pertinent law.  *Johnson Mgm't Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1252 (Fed. Cir. 2002) ("A contractor is responsible for the unexcused performance failures of its subcontractors."); *Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 957 (Ct. Cl. 1979) ("The contractor alone is responsible for the deficiencies of its suppliers and its subcontractors absent a showing of impossibility.").  Indeed, the history of the development of the past performance requirements undercuts Todd's argument.  *See* Policy Letter 92-5, 58 Fed. Reg. at 3574 ("The Government lacks privity of contract with the

subcontractor.  Moreover, the Government generally looks to the prime contractor to assure that subcontractors perform.  A prime contractor's ability to select subcontractors that perform is indicative of the contractor's management ability."); *Best Practices* at 15 ("As the Government only has privity of contract with the prime contractor, subcontractors, teams and joint venture partners should not be given a separate rating.  Comments on the performance of these firms will be reflected in the ratings for the prime.").

Although the Court indulges all reasonable inferences in favor of plaintiff's factual allegations, Todd's legal conclusions are not entitled to deference.  *Atlas Corp. v. United States*, 895 F.2d 745, 749 (Fed. Cir. 1990); *J.M. Huber Corp. v. United States*, 27 Fed. Cl. 659, 661 (1993).  The subcontractors' performance was inexcusable and there is nothing in the amended complaint beyond Todd's bare assertion of non-responsibility to support any conclusion that assigning "unsatisfactory" ratings was an abuse of discretion.  Because the facts as pled do not support a finding that "the discretion employed in making the decision [was] abused," *Todd II*, 88 Fed. Cl. at 248, plaintiff fails to state a claim.

## CONCLUSION

For the reasons stated above, the plaintiff's amended complaint is **DISMISSED** in its entirety.  The allegations regarding procedural violations are dismissed for lack of standing pursuant to RCFC 12(b)(1), while the remaining contentions, which assert that an "unsatisfactory" rating constituted an abuse of discretion by the agency, are dismissed for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  The Clerk of the Court is directed to enter judgment in favor of defendant in accordance with the foregoing.

**IT IS SO ORDERED.**

s/ George W. Miller
GEORGE W. MILLER
Judge